STATE *vs.* HENRY D. BELLIN *et als.*

DECEMBER 4, 1935.

PRESENT: Flynn, C. J., Capotosto, Baker, and Condon, JJ.

CAPOTOSTO, J. The defendants, Henry D. Bellin, Irving Pollay and Joseph Golden, together with William M. Peacock, Benjamin Saxe and Arthur Brody, were indicted for conspiracy to cheat and defraud the Rhode Island Mortgage Security Corporation, hereinafter referred to as the corporation. The offense is charged to have been committed from February 1, 1928, and divers other days thereafter from time to time until September 13, 1929. All the defendants waived jury trial under the provisions of Public Laws 1929, chapter 1335.

The case was tried before a justice of the superior court who found the defendants Bellin, Pollay and Golden guilty and acquitted Peacock, Saxe and Brody. The case is before this court on bills of exceptions prosecuted by the three defendants who were found guilty. The underlying contention of the defendants is that the evidence is insufficient to warrant a conviction for conspiracy. Pollay and Golden also urge that the trial justice erred in certain of his rulings during the trial.

The only material question in our view relating to such rulings that was briefed and argued in behalf of Pollay and Golden is raised by a series of exceptions to certain books of account kept by Bellin in his individual and private business, which he carried on under the name of the Bellin Realty Co., and to the records of a local bank in connection therewith. The evidence shows that Bellin, Pollay and Golden cooperated at the trial in attempting to establish that even though their conduct may have been unethical it was far from being criminal. It also appears that Bellin allowed counsel for Pollay and Golden to have possession of the books connected with his private business in preparation for or during the course of the trial. When counsel for Pollay and Golden sought to introduce these books or their contents in evidence through Bellin's bookkeeper, the

state immediately questioned their admissibility, whereupon the trial justice, before making any ruling on the matter before him, inquired of Bellin whether he intended to claim his constitutional rights against self incrimination. In view of some hesitancy on the part of Bellin in answering this question, and as the incident occurred late in the afternoon session, the trial justice adjourned court to give Bellin ample time to fully consider his rights in the matter.

When the trial was resumed, counsel for Bellin answered the court's inquiry in the following language: "For Mr. Bellin we object to the use of any of his private papers or private books at this time. Mr. Bellin does not intend to take the stand and does not intend to have any construction that will appear to be a waiver of any of his rights, and we feel an examination of any books of Bellin would be, or might be construed in that light, and therefore we object to the introduction or examination of this witness on any of his papers." The court thereupon excluded the books and noted an exception in favor of Pollay and Golden. Counsel for these defendants then asked a series of questions obviously intended to elicit information that was contained in those books. Bellin, apparently relying on his privilege that he had so directly and broadly claimed, remained silent, but the State objected to this line of inquiry in general and to each question in particular and finally urged upon the court that counsel for Pollay and Golden "should stop from now on examining this witness about these private records." The trial justice replied that ordinarily he would "prevent the counsel from persisting along this line, but, in view of the fact that there is no jury present and he has a right to preserve whatever rights his clients may have, I am going to allow him to ask whatever questions he pleases for the record to show that the questions were asked." It is quite evident from this statement that the trial justice, in permitting the questions to be asked and in refusing to allow an answer to them, was actuated by a sense of commendable fairness towards all the defendants and that he sought to

fully protect the rights of Pollay and Golden as well as of Bellin in respect to his rulings in the matter before him. The objections by the State were apparently treated by him not as objections that would have entitled it to a ruling as a matter of right, but rather as a reminder that the constitutional privilege claimed by Bellin might be inadvertently denied. In view of Bellin's objection to the use of his private papers or any examination thereof, the trial justice was warranted in excluding this testimony even without such reminder by the State. We cannot say therefore that the trial justice, who in this case was sitting without a jury at the election of the defendants, committed reversible error merely because after each specific question asked by counsel for Pollay and Golden he did not inquire of Bellin directly if he still continued to claim the privilege that he had so firmly and completely asserted. The exceptions of defendants Pollay and Golden to these rulings of the trial justice are overruled.

The main issue of fact before us narrows to a consideration of the dealings by and between these defendants with reference to one thousand shares, no par value, of the voting stock of the corporation. The claim of the State is that these defendants, from the earliest days of the corporation, conspired to secure this block of stock for illegal purposes, and that through subterfuge they did in fact divert these one thousand shares from the legitimate purposes of the corporation to their own collective and individual pecuniary advantage. It maintains that the appropriation of these shares by the defendants was conceived in fraud and collusively executed with a felonious intent. The defendants stoutly deny any conspiracy or intent to defraud the corporation and insist that their conduct, collectively and individually, in respect to these shares was both legal and proper. Their contention is that this block of stock represents a bonus to one of the defendants and that he used it, as he had a right to do, for his own purposes. Reduced to its simplest terms, the question is whether the transfer of

the one thousand shares was in fact an honest bonus, or whether the handling of that stock constituted a fraudulent segregation by the defendants of that number of shares from the corporate assets with the intent, whenever opportunity offered, to convert them into cash for their personal benefit.

A fair approach to this question demands that we start with the negotiations that led to the creation of the corporation itself and follow its management, with special reference to these one thousand shares, through the period covered by the indictment in this case. Unless otherwise indicated, the dates hereinafter mentioned refer to the year 1928.

In December, 1927, Golden was the treasurer and Pollay the sales manager of the Franklin Mortgage Corporation of Boston, Massachusetts. Both of these men had wide experience in promoting the sale of securities. About this time Bellin became interested with Pollay in the formation of a local concern along the lines of the Massachusetts corporation. Following a number of written communications, telephone calls and personal consultations between Bellin and Pollay, the Rhode Island Mortgage Security Corporation was incorporated in this State in March, 1928, for the primary purpose of lending money principally on the security of second mortgages. The capital structure of the corporation is not involved in the questions before us. It is sufficient for our purposes to state that the corporation was authorized to issue two classes of common stock, both with voting power, Class A stock of no par value, and Class B stock with a par value of one dollar, and also preferred stock of the par value of $50.

On April 10 Bellin met Pollay and Golden in the office of the Franklin Mortgage Corporation in Boston. At this meeting these three men discussed various matters including organization expenses, bonus stock and the necessity of securing $3,000 in order, as they claim, to protect their interests in the proposed corporation. The scattered bits

of testimony on this point show that Pollay and Golden finally agreed to advance $1,500 apiece to make up this sum. One week later Pollay, who came to Providence with Golden, gave Bellin $400 for organization expenses. Two days later Bellin wrote Pollay that "our" corporation was formed and on April 23 informed him that certain responsible persons of this city might be interested as directors. On April 26 he wrote again to Pollay saying: "Since you stated over the telephone yesterday that you thought that we ought to build up our Board to ten, I have been working on two other names." April 30 the Rhode Island bank commissioner was consulted as to the sale of the corporation's stock to the public, and on May 3 Pollay and Golden, after a long conference with Bellin in his office, gave him the $3,000 that had been previously discussed at their meeting in Boston on April 10.

Turning our attention to the corporation itself, we find that the real incorporators were this defendant Bellin, A. Henry Klein, his brother-in-law, Augustus A. Greene, an aged and retired jeweler, and William H. Bowker, who was in reality a representative of Bellin. These men elected themselves directors of the corporation on April 23 and then, notwithstanding a provision in the by-laws which requires five directors for a quorum to transact any business, they not only elected Greene president, Bellin to the offices of secretary and treasurer, and Klein as assistant treasurer, but they also constituted these persons as the executive committee of the corporation. At this same meeting they further voted to themselves the right to subscribe to one share of the common stock with no par value and one share of that stock of the par value of one dollar at the price of one dollar per unit of such stock. On this basis Greene subscribed for $1,000 worth of that stock, Klein for $3,000, Bowker for $500, and Bellin for $1,500. In return for these subscriptions they received temporary certificates representing a total of twelve thousand shares of the common and voting stock of the corporation. The six thousand

shares that went to Greene, Bowker and Bellin under this arrangement were purchased with the $3,000 that Pollay and Golden agreed to furnish on April 10 and which they actually gave Bellin on May 3.

The temporary certificates for the three thousand shares that were issued to Greene and Bowker were immediately endorsed in blank by them and turned over to Bellin at his request. On this same day, although Greene and Bowker had received nothing from Pollay, they signed collateral notes in the aggregate sum of $1,500 payable to Pollay one month after date. These notes were found in Bellin's papers and show that they were endorsed by Pollay "without recourse."

The sale to the public of the stock of the corporation was authorized by the Rhode Island bank commissioner onMay 12 on the express condition that the commissions to the salesmen should not exceed twelve and one-half per cent of the actual sales. On the same day the applications of Saxe, Brody and Golden to act as salesmen were approved. The evidence discloses no record in the office of the bank commissioner showing Pollay's connection with the company in any capacity at any time. About the first of June the salesmen began to sell the stock of the corporation in units of two shares of preferred stock and one share of common stock, no par value, for $150 per unit. Up to June 9 subscriptions had been received and partial payments accepted for stock in the corporation.

We now come to an alleged special meeting of the stockholders on June 9 over which the parties are in conflict. The minutes of this meeting represent that Greene, Klein, Bowker and Bellin were the only stockholders entitled to be present and that were actually present on that day; that they met in special meeting as stockholders and that they voted to issue one thousand shares of the no par value common stock of the corporation to Pollay as a bonus for his services in supervising the sale of the stock, in addition to the fees that the executive committee, composed of

Greene, Klein and Bellin, should vote to pay him. In his testimony Bowker denies that he was present at a meeting where any such action was taken, even though the records bear his signature, and he strongly intimates that this entry was made after he had signed the records and without his knowledge or consent. The State claims that this meeting was never held and that the minutes were signed in blank by the directors and filled in by Bellin, but that if it did take place, it was nothing but a screen, fraudulently and intentionally devised to cover the abstraction of the one thousand shares of common stock that Bellin, Pollay and Golden ultimately converted to their own use. The defendants deny this accusation and insist that the action taken at this meeting was not only legal but in accord with customary practice. We will leave this issue for the time being in order that certain other facts bearing upon the principal question before us may appear in their chronological order.

The first meeting of the executive committee, with Bellin as clerk, was held on June 19 when the form of the stock certificates was approved and the Industrial Trust Company was named registrar and transfer agent to act as such only upon the written order of the clerk of the executive committee, Bellin. At this same meeting Pollay was first employed by the corporation to supervise the sale of its stock.

The sales of unit stock to the public were duly recorded in the books of the corporation in the regular course of business. As we will presently indicate, we find a departure from this practice when we begin to trace the sale of the one thousand shares of bonus stock that were voted to Pollay. It may be well to state at this point that the total number of shares of the voting stock of the corporation outstanding at any one time never exceeded seventeen thousand five hundred and that Bellin, Klein, Greene and Bowker controlled twelve thousand of those shares by virtue of the vote of the alleged board of directors of April 23, to which we have already referred.

We next come in contact with the one thousand shares of bonus stock on October 30, when Bellin ordered the issuance of that number of shares of no par common stock of the corporation in Pollay's name. On October 31 the bank complied with this order and delivered the stock to Bellin's secretary. Pollay testified that this stock was turned over to him and that he kept it in his office in Boston until November 13. This testimony cannot be reconciled with the facts that follow. On the very day that these shares were issued in Pollay's name we find them deposited with the corporation as collateral security for four notes, each in the sum of $5,000, payable to the corporation and signed by William M. Peacock. The evidence shows that these notes were signed by Peacock, who was never connected in any way with the corporation, as a favor to Bellin. Upon the strength of these notes and collateral Bellin received $20,000 from the corporation in two checks, one dated November 1 for $5,000 and the other dated November 8 for $15,000. We find nothing in the record to indicate that either Peacock or his wife received any benefit directly or indirectly from this transaction, or that he knew the use to which his notes were to be applied.

The $20,000 that Bellin received from the corporation on the Peacock notes was divided among Bellin, Pollay and Golden, $7,000 to Bellin and the balance to Pollay and Golden. The defendants' explanation of this division of the money is that the $13,000 to Pollay and Golden represent the repayment to them of the $3,000 that they loaned Bellin on May 3 for the purchase of stock by Bellin, Klein and Bowker, and that the other $10,000 was the price that Bellin paid Pollay when he bought Pollay's one thousand shares of bonus stock. The State says that this is pure fiction. It refers to the provision on the certificates that "The corporation shall have the first right to purchase its common stock outstanding at the lowest price at which holders thereof are willing to sell the same, provided that the board of directors shall vote so to purchase it" and points

out not only that this provision was absolutely disregarded in the transaction that Bellin and Pollay now choose to call a sale, but also Pollay's unreasonable explanation to the effect that he believed the clause in question applied to the purchaser and not to the holder of the stock who was about to make a sale. The State characterizes the alleged sale as a flagrant fraud intentionally perpetrated by these defendants in furtherance of their original conspiracy to cheat and defraud the corporation.

In view of these contentions it becomes necessary to ascertain what happened to the one thousand shares of bonus stock that were pledged as collateral security for the Peacock loan. Soon after the Peacock transaction we begin to find a change in the stock selling policy of the corporation and in the manner in which the records of sales and commissions were kept. The unit proposition of two shares of preferred stock to one of common stock for $150, which theretofore had been the basis of all sales to the public, was in time practically discontinued, and in its stead the bonus stock was put upon the market presumably as the treasury stock of the corporation at $50 a share. All records and papers connected with the sale of stock to the public under the original unit plan were kept in the office of the corporation. Every such sale was duly recorded and a statement given to the salesmen, who were paid their commissions by check and were required to sign a receipt for any money that they received. The system was different in the sales of the bonus stock. None of these sales were ever recorded in the regular books of the corporation. The only record of such sales was made by Bellin and kept in seventy-one envelopes in his private office. The commissions to the salesmen for the sale of this stock were paid almost always in cash and receipts were frequently signed by them in blank or with the fictitious name "John A. Anderson." Gross commissions of between twenty-five and thirty percent were paid to the agents, including Pollay and Golden, for the sale of this stock in utter disregard of the

bank commissioner's limitation as to the amount of commission that might be paid to the agents for the sale of stock.

In regard to this situation the defendants say that Bellin, who had become the owner of these shares by purchase from Pollay, was free to dispose of them as his private property in any way he saw fit and to keep whatever records he desired in any place he chose. The State interprets this situation differently. It maintains that Bellin and Pollay, after stealing $20,000 from the corporation by means of the Peacock loan, were now selling the collateral that was given to secure that loan for their personal benefit and pecuniary advantage.

With these claims in mind, we look further and we find in the books of the corporation a loan account in the name of Alice T. Peacock for $20,000 payable to the corporation. It is beyond question that no loan of any kind was ever made to her directly or through her husband, William M. Peacock. As a matter of fact, this account represents the money paid to Bellin on the Peacock notes and which was divided among these three defendants.

The one thousand shares of bonus stock were actually used to fill subscriptions for treasury stock of the corporation and brought in the total sum of $52,690. We also find a "J. Golden Exchange" account started in May, 1929. Memoranda in the seventy-one envelopes kept in Bellin's private office show that, with the exception of commissions, a record of practically all the money that was received from the sale of bonus stock was kept in those envelopes or in the "J. Golden Exchange" account. The books of the corporation disclose that $20,438.93 of the $52,690, that was received from sales of the bonus stock as treasury stock of the corporation, was used to liquidate the so-called Peacock loan; $7,000 was credited to an obligation of the "Bellin Bros." to the Rhode Island Hospital Trust Company, and $11,248.87 was checked out to J. Golden from the "J. Golden Exchange" account. Receipts for commissions found in the envelopes may be summarized as

follows: $2,158.75 signed Brody; $3,121, Saxe; $4,198.12, Golden, and $250, Pollay. Certain other checks payable to the corporation amounting to $3,400 and that were given in payment of subscriptions filled by bonus stock were endorsed in the name of the corporation by "Henry D. Bellin—Treasurer" and cashed over the counter. We have been unable to discover what was done with this money after it came into possession of the person who cashed the checks. The total of these various sums that we have gathered from the many and confusing exhibits amounts to $51,815.93, which is within $874.07 of the $52,690 received from the sale of all the bonus stock.

Bellin's attorney and counsel for Polley and Golden are not in complete accord in construing these facts. We are not concerned at present as to whether their differences are real or are strategic moves in aid of a common defense. The important fact is that there is a variance in their respective positions. The attorney who now appears for Bellin but who did not represent him at the trial in the superior court, argues that Bellin's action in the premises, even if deemed unethical, is innocent because it is nothing more than the exercise of his rights as owner of the shares that he purchased from Pollay. Counsel for Pollay and Golden take the position that Bellin committed no wrong in acting as he did with shares that legally belonged to him, but that if he was guilty of any offense it was chargeable to him alone as Pollay and Golden, who were mere salesmen carrying out his orders, had no knowledge of his wrongdoing. Counsel for all three defendants agree in attaching slight if any significance to the "J. Golden Exchange" account, for they either ignore it completely or casually dismiss it as an incident of private bookkeeping on the part of Bellin.

In opposition to these claims the State maintains that the manipulation and sale of the bonus shares was in execution of the illegal agreement entered into by these three defendants to deprive the corporation of whatever sum the

block of one thousand shares would bring when sold at a time and price satisfactory to them. It argues that Bellin was the medium through whom these shares were put on sale and foisted upon the public to the financial loss of the corporation, and that the "J. Golden Exchange" account represented nothing more than the share of the common profits that Golden was to divide with Pollay.

These divergent contentions oblige us to pick up the trail once more in a wilderness of details. On December 8 the executive committee, composed as we have already stated of Bellin, Klein and Greene, specifically ratified the action taken at the special meeting of the stockholders on June 9, when the issue of one thousand shares of bonus stock to Pollay was first approved. At this same meeting they "ratified for payment" a number of checks of the corporation identified by letter and numerals as B 26 to B 135. Included in this series of checks are B 108 for $5,000 and B 115 for $15,000 that figured in the fictitious loan to Peacock.

The annual meeting of the stockholders was held on January 9, 1929, at which time Bellin presented his report as treasurer setting forth "the condition of the Company on January 1, 1929" according to data furnished him by a public accountant. The minutes of the meeting in reference to this matter are as follows: "Said report was read in detail and discussed and at the conclusion of the discussion a resolution was proposed and was unanimously adopted, said resolution being as follows, viz: 'Resolved, that the Treasurer's Report be and it hereby is accepted and ratified by the stockholders; that it shall be spread upon the records of this meeting; that whereas, the term of the Treasurer, The Directors, the Executive Committee and the officers is about to expire with this meeting and the annual elections are to be held, and, whereas, the condition of the corporation and the management of the Board are reflected in the report of the Treasurer, now, therefore, the stockholders hereby ratify, approve and accept the manage-

ment and operation of the business of this corporation by said Board, Committee, Treasurer and other officers from April 23, 1928, to date as appears on the books and records including contracts negotiated by them, loans made, funds borrowed, stock sold or issued (by them or by the Industrial Trust Company the Registrar and Transfer Agent and the manner of selling and issuing the same).'" The resolution then proceeds to extend "the thanks of the stockholders" to the various officers and board, for serving without pay; it discharges and releases them from "any and all claims and demands whatsoever during their respective terms," and it ends by saying: "Their continued faithful service, assistance and guidance is hereby respectfully requested." We fail to find in this all-inclusive resolution that is now urged by the defendants as a specific ratification of the Pollay bonus stock, any reference whatsoever to the special meeting of the stockholders that was held on June 9, or any disclosure that at that meeting one thousand shares of the stock of the corporation was voted to Pollay in the form of a bonus.

We pause here briefly to point out the inferences that the parties draw from these various ratifications. In his brief, counsel for Bellin, contending for all three defendants, says: "Even assuming that there was some technical infirmity in the meeting of June 9, 1928, the business then transacted —including the vote authorizing the issue of the Pollay shares—was repeatedly and effectively ratified and confirmed." A little later in the brief he becomes more positive and says: "Not only was the issue of the one thousand bonus shares to Pollay formally authorized and decisively ratified by regular corporate action and never questioned by any one in authority throughout the active existence of the corporation, but there was nothing in the transaction itself—when denuded of the specious, misleading and extravagant submissions of the State and when the real facts are uncovered—to indicate any fraudulent design on the part of the participants or to show any unfair

advantage taken of the corporation." The State, on the other hand, takes the position that these ostensible ratifications, extremely broad in language and reckless as to substance, constitute a series of vicious acts done at the instigation and under the influence of Bellin as a further. cloak to the fraud that he and his associates, Pollay and Golden, were perpetrating to the damage of the corporation.

We now come to the defendants' final contention which is that about the middle of January, 1929, Pollay severed all connections with the corporation and returned to Boston, and that Golden, who thereafter became the sales manager here, was merely an agent who obeyed orders and was charged with no duty as to the keeping of books or as to the application of the money that was received from the sale of stock. Directing our attention for the present to Pollay, the bookkeeper testified that she was employed as such during the entire active existence of the corporation and that she never was informed, knew or heard that Pollay had resigned or ceased to be in the employ of the corporation. Pollay, in his testimony, says: "Until I left, Mr. Golden and myself were dividing whatever profits there were." We have already stated that soon after the alleged sale of the bonus stock by Pollay to Bellin this stock was gradually substituted for treasury stock in filling subscriptions to the stock of the corporation. This practice continued well into July, 1929. In a letter dated February 1, 1929, directed to the corporation, Pollay requests that all checks for commissions be made payable to Golden. The defendants say that this letter was written to correct an error in bookkeeping as all commissions at that time belonged to Golden. Following this communication, however, we find two checks, dated February 8, and February 15, 1929, made payable to "J Golden or I. Pollay" for $465 and $476.63, respectively. These checks were endorsed in blank by Golden and both were cashed in Boston, the former on February 11, and the latter on February 18, 1929.

A subscription dated November 15, 1928, for one hundred shares of the common stock of the corporation was filled by the transfer to that subscriber of one hundred such shares from the one thousand shares that were given to Pollay, leaving a balance of nine hundred shares outstanding in that original issue. On January 9, 1929, the board of directors passed a resolution that "this corporation shall declare a special stock dividend as viz: To holders of 'Common Stock without par value' as appear on the books of this Corporation on February 1, 1929, this corporation shall issue at the rate of one-tenth of a share of 'Common Stock without par value designated as Class A stock' for each share of 'Common Stock without par value' so held. That said special stock dividend shall be issued and payable on February 12, 1929." The stock ledger and the card index of the stockholders of the corporation for its entire existence show that Pollay did not have any shares of any kind at any time registered in his name on the books of the corporation. A certificate for ninety shares of the common stock of the corporation dated February 1, 1929, representing a stock dividend on nine hundred shares of non par common stock in accordance with the resolution for a stock dividend passed by the directors on that date was sent to and received by Pollay. At that time Pollay was entitled to a dividend only on the assumption that he was still the real holder of nine hundred shares of common stock that he had received as a bonus. An endorsement on the back of the stock dividend certificate shows that Pollay held the ninety shares represented by that certificate until April 10, 1930, when he transferred them to one John C. Champlin. A letter dated April 6, 1929, signed "Irving Pollay by J. Golden, Agent" states: "I hereby waive any dividends to which I may be entitled to on any common stock standing in my name." These circumstances are apparently considered of no importance by the defendants for they are allowed to go unnoticed by them.

On November 15, 1928, a businessman of this city subscribed to one hundred shares of the corporation's treasury stock in the sum of $5,000, and received bonus stock instead. This person testified that on March 1, 1929, he met Pollay in Bellin's office and not only dealt with him in reference to his shares but also signed a certificate at his request. Pollay denies that this meeting took place. His testimony is that the only time he visited the office of the corporation after his withdrawal was when he came to Providence with Leon Goldstein of the Standard stores, who was interested in the possible purchase of the local corporation, and that he did not then or at any time thereafter transact business with any one concerning any outstanding stock of the corporation. Counsel for Pollay dismiss this contradiction in the testimony that bears directly on the question of credibility by saying: "Pollay having testified that he had been back to the office after resigning, it is submitted that this testimony in rebuttal is in contradiction of nothing material."

With respect to Golden, we find in this period from November, 1928, through July, 1929, the "J. Golden Exchange" account, to which we have already referred, and a series of checks, apparently for commissions and made out in the name of "John A. Anderson or Bearer" that were either deposited or cashed by Golden under his own name.

In exhaustive arguments counsel for all these defendants attempt to discount the significance of this series of facts and to construe them as the individual acts of men who may have been unethical and unguarded in their conduct but in no sense criminally inclined. The State, on the other hand, firmly insists that these additional circumstances complete the chain of overt acts which, in spite of every effort at falsification, misrepresentation and willful disregard of duty to the corporation and its stockholders, conclusively binds Bellin, Pollay and Golden in a conspiracy to convert the funds of the corporation to their own use and advantage.

We have been able to assemble these facts with great difficulty from a mass of testimony of varying degrees of credibility. It represents but a small percentage of the affirmations, denials, contradictions, and explanations that the trial justice listened to for over twenty-six court days. He had the privilege of seeing and hearing all those who testified, a fact that is of great advantage in determining the real value of oral testimony. The trial justice at the end of the testimony and after the arguments of counsel reserved his decision, and later, in a carefully prepared rescript that reflects a serious consideration of all the evidence, found Bellin, Pollay and Golden guilty.

A conspiracy to cheat and defraud an individual or corporation of its property or money is complete when an agreement or understanding is reached by two or more persons to commit the unlawful act, even though the means by which that purpose is to be accomplished are undetermined. The offence consists in conspiring with a view to effect the intended mischief and not in the acts that may be employed to accomplish that end. *State* v. *Bacon*, 27 R. I. 252. Any person, who with knowledge of a conspiracy, intentionally takes any part in or does any act to further the illegal agreement or understanding becomes a participant in the conspiracy and is criminally responsible. In our statement of the facts we have indicated in different places the contentions of the State and of the defendants in order that their contentions might be more easily understood. It is unnecessary to repeat them.

The defendants rest their case upon the soundness of their premise that the grant of the one thousand shares of bonus stock on June 9, 1928, to Pollay as compensation for efficient service, was a legitimate and proper exercise of the power vested in the stockholders at that alleged meeting. The defendants minimize to the point of immateriality everything that occurred before June 9. They assume that the meeting held on that day was a valid meeting of the corporation, and then they say that the grant of the bonus

stock to Pollay was justified in fact and in law, but that if any "technical infirmity" impaired its validity such defect was cured by the various ratifications that followed.

We do not agree with the defendants that what transpired previous to the meeting of June 9 is of no consequence. On the contrary, we believe that it is of significant importance. Experience shows that the roots of a conspiracy, if any exists, are generally found in the origin and early stages of an undertaking. It is for this reason that we have recited the circumstances connected with the early days of this corporation. These facts and the inferences that naturally and reasonably arise therefrom constitute material links in the chain of proof that ultimately establishes the guilt or the innocence of these defendants.

We agree that bonus stock may be issued by a corporation to promoters or employees under certain conditions and in the absence of any fraud or concealment. The promoters of a corporation stand in a confidential and fiduciary relation to the corporation and its stockholders. They are not precluded from dealing with the corporation provided there is a full and fair disclosure of any such dealings. An agreement between promoters, one of whom becomes a member of the board of directors of the corporation, is in no way binding upon the corporation. In a corporation where it is intended to have other stockholders, if the directors are the promoters or persons jointly interested with them or under their control, any agreement between such directors and promoters is not binding on the corporation, for the reason that the promoters who are also directors cannot represent themselves and the corporation at the same time. *Anderson* v. *Johnson*, 45 R. I. 17, and cases cited. This rule applies with equal if not greater force to an agreement or understanding between promoters to bind the corporation through the acts and conduct of one of their own number who becomes a director on an initial board of directors of his own choosing and under his control.

In this case the evidence clearly establishes that Bellin, Pollay and Golden raised the question of bonus stock at the very outset of the undertaking and continued to give it serious consideration throughout the preliminary and early stages of the corporation; that Pollay and Golden furnished the funds necessary for incorporation expenses and for the purchase of stock for Bellin, Greene and Bowker; that the temporary certificates issued to Greene and Bowker for the stock so purchased were turned over to Pollay, who, according to his own testimony, was dividing with Golden whatever profits came from the venture, at least up to the time of his alleged retirement from the corporation in January, 1929; and that Bellin and his three associates on the board voted to themselves the right to purchase the voting stock of the corporation under a plan that assured them control of the corporation at all times. These established facts affirmatively prove that these defendants willfully disregarded their confidential and fiduciary relations to a corporation that was designed to have and later actually did have many other stockholders. From a close examination of the testimony it is quite evident why the defendants are so insistent that we dismiss as immaterial everything that happened previous to June 9, 1928, and that we start our consideration of the case with the assumption that a valid meeting was held on that day.

The meeting of June 9, 1928, is affected by more than a "technical infirmity" as suggested by the defendants; it has inherent defects that deny its validity in so far as the grant of the bonus stock to Pollay is concerned. Article 1, section 2 of the by-laws of the corporation, adopted April 23, 1928, provides that special meetings of the stockholders shall be "called in writing by a majority vote of the Board of Directors." Article 2, section 6, states that "A majority of the Board of Directors but in no event less than five shall constitute a quorum." In spite of a most careful search we have been unable to discover the record of any action taken by the board of directors in reference to a special

meeting of the stockholders to be held on June 9, or under what authority the meeting of that date was called by Bellin. It therefore appears that Bellin himself called the meeting, that he, Klein, Bowker and Greene were the only stockholders present, and that they alone voted the one thousand shares of stock to Pollay in the form of a bonus even before he was actually employed by the corporation.

Notwithstanding these provisions of the by-laws and the established facts, the defendants maintain that the meeting of June 9 was both legal and proper. They have furnished us with numerous citations and extracts from authorities dealing with the question of bonus stock. We agree with the general proposition that the issue of bonus stock is permissible under certain conditions and when properly authorized, yet not one of the cases submitted to us even remotely approaches in its facts the situation presented by the case at bar. We find no authority in these cases to warrant us in approving the grant of bonus stock at a special meeting of stockholders that is called and held in disregard of the express provisions of the existing by-laws.

In connection with the meeting of June 9, 1928, and with special reference to those who were entitled to participate in that meeting, it is worthy of notice that on May 1, 1928, Bellin and his three associates on the board of directors accepted a subscription in the sum of $1,000 for stock of the corporation; that they voted that said stock would "be forthcoming from among them," and that they elected this subscriber a member of the board. The evidence shows that this subscriber had absolutely no knowledge that a special meeting of the stockholders was called for that day. From the brief and the argument before us we infer that counsel for Bellin finally takes the position that until this subscriber had received a stock certificate for his shares he was not entitled to be present at a stockholders' meeting. This contention is not convincing. It evades the question as to whether Bellin and his associates on the board had actually recognized this subscriber as a stockholder. It is

not necessary for our purpose to determine his actual status on June 9. We are interested in this matter only as evidence of the lack of good faith and fair dealing on the part of Bellin and the other members of the board.

We consider as invalid the ratifications that we have heretofore described and upon which the defendants rely to cure any "technical infirmity" in the meeting of June 9. A valid ratification by resolution as in this case can be predicated only upon a full and fair disclosure of whatever act or conduct is sought to be ratified. The attempted ratification at the stockholders' meeting of January 9, 1929, is invalid because there is not such a disclosure. We find no assistance to the defendants in the ratification of their own acts by Bellin, Klein and Bowker, acting as an executive committee. Nor do we believe that the mere reading of the minutes of the June 9 meeting, containing as they do many different and complicated matters, was an honest and sufficient disclosure to the stockholders in their meeting of January 9, 1929, to justify us in holding that they had knowingly ratified the issue of the one thousand shares of voting stock as a bonus to Pollay in compensation for future services, and before he was actually hired by the corporation. The blanket approval of the executive committee's acts over a period of nearly two years by the board of directors on April 4, 1930, was a meaningless gesture in so far as the meeting of June 9 is concerned. This series of attempts at ratification in one form or another and at different times serves to focus attention upon at least Bellin's knowledge of the inherent weakness of that meeting.

Counsel for Pollay argues at length that Pollay derived no improper pecuniary benefit from the sale of the bonus stock in general and from the "J. Golden Exchange" account in particular. This argument is untenable. Even if a conspirator derives no financial advantage from any participation in a conspiracy to cheat and defraud, such fact does not excuse his intentional participation therein. It is not necessary, to render one criminally liable as a con-

spirator, that he should have participated in the fraudulent scheme with the view of obtaining any pecuniary advantage for himself. *State* v. *Bacon, supra.*

The credible evidence in this case and the inferences that naturally and reasonably arise therefrom clearly establish that Bellin, Pollay and Golden, by fraudulent means and in pursuance of a common agreement or understanding, segregated a block of one thousand shares of the voting stock of the corporation under the guise of a bonus to Pollay, which said shares were to be sold and were sold by them for their common and individual advantage in a manner that their own interests dictated. In view of this conclusion it becomes unnecessary to discuss in detail the various other incidents in the chain of circumstances that we have hereinbefore set forth with considerable particularity and which speak for themselves. It is sufficient for us to say that we consider the sale of the bonus stock by Pollay to Bellin a pretense, the Peacock loan a fraud, and the sale to the public of the bonus stock as treasury stock of the corporation a misappropriation of funds that rightfully belonged to the corporation. All three defendants, in furtherance of a common plan or understanding, knowingly participated in some, if not all, of these dishonest acts to the damage of the corporation of which one was an officer and the other two were trusted agents. The record in this case, construed as a whole, fixes the guilt of each defendant beyond a reasonable doubt. There is no error in the decision of the trial justice that finds each of these defendants guilty of conspiracy as charged in the indictment.

All the exceptions of each of these defendants are overruled and the case is remitted to the superior court for further proceedings.

*John P. Hartigan, Attorney General, Michael De Ciantis, Assistant Attorney General,* for State.

*Rosenfeld & Hagan, C. Bird Keach,* for defendants Pollay & Golden.

*George R. Farnham, of Boston, Frank H. Bellin, Arthur L. Goldman, of Boston,* for defendant Bellin.