291 A.2d 425.

State *vs.* Wayne Gilman.

State *vs.* Wayne Gilman.

JUNE 9, 1972.

Present: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. A Superior Court jury found the defendant, Wayne Gilman, guilty of conspiring to deliver and the unlawful possession of a central nervous system stimulant. The charges which are contained in two separate indictments were consolidated for trial. We have consolidated the appeals and the bill of exceptions filed by the defendant in each case.

The charges arise out of an incident that occurred on the early evening of December 10, 1968. The jury was presented with two different versions of what transpired.

The prosecution's version was given by a state narcotics inspector who was working undercover posing as a college student.

The inspector said he met Gilman at approximately 6:00 p.m. on the day in question and informed Gilman of his desire to buy some marijuana. Gilman replied that he had none but he knew someone in Narragansett who sold "speed" (amphetamine). Gilman entered the inspector's car and they proceeded to Narragansett. The inspector drove and Gilman gave the necessary directions. Within a matter of minutes, the group arrived at the home of Philip Greene and his wife. Upon entering the Greenes' home, the inspector was introduced to the Greenes and several

others including a Craig King and a man by the name of Sherry. When Greene was told of the purpose of the inspector's visit, he said that he had only enough "grass" (marijuana) for his own use but that a shipment of "speed" was expected.

After a lapse of ten minutes, the gathering took on significance with the arrival of a Mr. Thomas who brought with him a clear plastic bag containing white powder. It is undisputed that the powder was amphetamine. All present gathered around the kitchen table and began to divide the "speed" into small piles and then place each pile into a glassine packet. The inspector was asked if he wanted to buy some "speed." Gilman and Sherry[1] vouched for his reliability and all present gave their approval to the transaction. King sold the inspector a packet for $20. Gilman and the inspector then left the Greenes' homestead and returned to a North Kingstown bowling alley where the two separated. The inspector rendezvoused with some of his fellow officers who had kept him under surveillance as he went to and from Narragansett. The packet was initialed and delivered to the state toxicologist. The defense did not cross-examine the inspector.

Gilman testified that he was at a North Kingstown bowling alley when he was approached by a friend and the inspector. They asked him if he wished to take a ride to Narragansett. Gilman's friend initiated the conversation by asking Gilman if he had any marijuana. Gilman answered in the negative whereupon the inspector remarked that he (the inspector) might be able to find some in Narragansett. The defendant said that the inspector asked him whether he had some "grass" and he replied that he had no "grass" and he knew of no one who had.

---

[1] The inspector had been in the North Kingstown-Narragansett area for some time prior to December 10, 1968. During this period, he had met Gilman and Sherry and apparently convinced them that he was a student.

The defendant insisted that it was his friend who acted as the navigator on the trip which ended at the Greene residence. He conceded that he was present when the "speed" was divided and at the time the sale took place. Gilman admitted that he knew the people who had gathered in the Greenes' home but he had no idea where they lived. He expressly denied that he did any separating or bagging of the "speed" or that he had anything to do with the sale.

Another inspector testified that he had observed Gilman in the company of his alleged co-conspirators on several occasions prior to the Narragansett transaction. This witness also told the jury that two months earlier Gilman and the undercover agent were present when a sale of a "spoon of speed" took place.

The defendant presses several exceptions. Those meriting consideration relate to the overruling of demurrers he had filed to each indictment, the adequacy of the testimony adduced by the state and the correctness of a portion of the charge given the jury.

### The Indictments

The conspiracy indictment was drawn according to the provisions of G. L. 1956, §§12-12-6 and 12-12-7. The relevant portions of the indictment read that Gilman and several others present when the amphetamine was divided and bagged "* * * conspired together with each other to deliver or caused to be delivered a central nervous system stimulant, to wit, amphetamine, in violation of the provisions of Title 21, Chapter 29, Section 3(a) of the General Laws of Rhode Island, 1956, as amended."

Gilman, in demurring to this indictment, claims that the quoted language is conclusory and violative of his constitutional right to due process in that it fails to reasonably apprise him of the nature of the charge lodged against him. We recognized such a right in State v. Brown, 97

R. I. 115, 196 A.2d 133 (1963), and at the same time reaffirmed the Legislature's right to prescribe the form or manner of stating a charge in a criminal process.

The indictment under inspection alleges a conspiracy which is an offense at common law and then goes on to refer to the specific statutory offense which is the subject of the conspiracy. The state has fulfilled its constitutional obligation. In *State* v. *Smith*, 56 R. I. 168, 184 A. 494 (1936), the attack, identical to the one launched by Gilman, was made upon a conspiracy indictment. We see no need to repeat here what was said in the *Smith* case. It is obvious from a reading of the indictment that Gilman stands charged with conspiring with others to perpetrate an illegal delivery of a central nervous system stimulant. If defendant wished further information as to the delivery, he could have filed a motion for a bill of particulars as was his right under §12-12-9. His failure to do so is, we believe, some indication as to Gilman's true realization as to the nature of the charges made against him.

Before us, Gilman claims that the indictment is duplicitous in that it alleges that he conspired "to deliver or caused to be delivered" the amphetamine.[2] The fallacy in defendant's reasoning is that he confuses the crime with which he is charged (conspiracy) with its goal. It is well settled that conspiracy is a single offense even though the agreement upon which the charge is founded envisions the performance of several criminal offenses or acts. *Braverman* v. *United States*, 317 U. S. 49, 63 S.Ct. 99, 87 L.Ed.23 (1942); *People* v. *Bradley*, 169 Colo. 262, 455 P.2d 199 (1969); *State* v. *Spence*, 36 N. J. Super. 314, 115 A.2d 585 (1955). Moreover, an indictment charging conspiracy need not set forth the object of the conspiracy with the same particularity that would be required for an indictment alleging the commission of the crime which is the object of

---

[2]This ground was not argued before the trial justice.

the conspiracy. *Wong Tai* v. *United States,* 273 U. S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927); *Brown* v. *United States,* 403 F.2d 489 (5th Cir. 1968); *State* v. *Smith,* 240 So.2d 807 (Fla. 1970). A conspiracy indictment is not duplicitous because the allegation of acts which would amount to substantive offenses is merely descriptive of diverse objects of the conspiracy.

The second indictment charges Gilman with violating §21-29-3(d). In pertinent part this section states: "The following shall be unlawful: * * * (d) The actual or constructive possession or control of a barbiturate or a central nervous system stimulant by any person * * *." The sole basis for the demurrer to this charge is Gilman's contention that the statute violates his due process rights because it penalizes the possessor without any necessity of a showing that the possessor knew of the nature of the contraband. The trial justice, in overruling the demurrer, held that the statute implicitly required a showing of knowledge by the possessor. We agree.

Read literally §21-29-3(d) imposes a strict criminal liability without regard as to whether the accused knew the prohibited substance was in his possession. This section cannot be construed as merely relating to circumstances which give rise to a prima facie case sufficient to establish guilt. [Compare the policy-lottery slip statute discussed in *State* v. *Tutalo,* 99 R. I. 14, 205 A.2d 137 (1964).] At common law, knowledge of the illegal character of the act was an essential ingredient of a criminal offense. *State* v. *Labato,* 7 N. J. 137, 80 A.2d 617 (1951). The Legislature may, however, make criminal an act regardless of the awareness, or lack thereof, on the part of the responsible party of the factors that make his conduct criminal and, in such a case, only the doing of the proscribed act need be shown. *United States* v. *Balint,* 258 U. S. 250, 42 S.Ct. 301, 66 L.Ed.

604 (1922);[3] *Speidel* v. *State,* 460 P.2d 77 (Alas. 1969);
*Commonwealth* v. *Buckley,* 354 Mass. 508, 238 N.E.2d 335
(1968); *State* v. *Labato, supra;* Packer, *Mens Rea and The
Supreme Court,* The Supreme Court Review at 107 (1962);
Sayre, *Public Welfare Offenses,* 33 Colum. L. Rev. 55 (1933).
Since the turn of the century, there has been an increasing
tendency to impose criminal sanctions without regard as to
whether the accused knew his actions were prohibited or
illegal. This has come about by the legislative regulation
of various industries, trades or activities that affect the pub-
lic's health and safety. Typical objects of such legislative
attention are the food and liquor industries.

Such regulations are described as "public welfare of-
fenses." In *Morissette* v. *United States,* 342 U. S. 246, 72
S.Ct. 240, 96 L.Ed. 288 (1952), Mr. Justice Jackson, in dis-
cussing "public welfare" or "strict liability" offenses, indi-
cated that the penalties for such behavior are "relatively

[3]Balint's conviction for an unlawful sale of narcotics was sustained de-
spite his claim that he did not know that they were subject to federal
regulation. Later, in *United States* v. *Dotterweich,* 320 U. S. 277, 64 S.Ct.
134, 88 L.Ed. 48 (1943), the imposition of a penalty on a corporate officer
whose firm shipped adulterated and misbranded drugs in violation of the
Food and Drug Act was affirmed even "though consciousness of wrong-
doing be totally wanting." The defendant in *Morrissette* v. *United States,*
342 U. S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), was charged with the con-
version of government property. He thought it had been abandoned. His
conviction was set aside because of the government's failure to show a
knowing conversion. In *Lambert* v. *California,* 355 U. S. 225, 78 S.Ct. 240,
2 L.Ed.2d 228 (1957), a conviction based upon the defendant's failure to
comply with a city ordinance which required the registration of all con-
victed felons was set aside where there was no proof that the defendant
had knowledge of the ordinance. Last year, in *United States* v. *Freed,*
401 U. S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the dismissal of
charges making the illegal possession of hand grenades a violation of the
National Firearms Act was set aside with the Court stressing that this
offense resembled that involved in *Dotterweich* and consequently there
was no need to show that the accused was aware of the unregistered status
of the hand grenades. The Act's strict liability, the Court observed, may
have been premised on the theory that the possessor could hardly be
surprised to learn that possession of a hand grenade is not an innocent act.

small" and the "conviction does no grave damage to an offender's reputation." 342 U. S. at 256, 72 S.Ct. at 246, 96 L.Ed. at 297. Later, in *Smith* v. *California*, 361 U. S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), the Supreme Court observed that a state's power to establish strict criminal liability is not "without limitations" particularly with regard to the due process requirement of notice.

In holding that the prosecution must show a conscious possession of the contraband described in §21-29-21, we shall not rest our conclusions upon the guidelines laid out in the *Morissette* case or attempt to delineate the due process limitations referred to in the *Smith* case. Indeed, it can be said that strict criminal liability is not necessarily a denial of due process. *Commonwealth* v. *Moore*, Mass., 269 N.E.2d 636 (1971). Rather, we shall follow the lead of those jurisdictions who construe the word "possess" when used in a criminal statute to mean an intentional control of a designated object with knowledge of its nature. *People* v. *Williams*, 5 Cal.3d 211, 485 P.2d 1146 (1971); *State* v. *Harris*, 159 Conn. 521, 271 A.2d 74 (1970); *State* v. *Reed*, 34 N. J. 554, 170 A.2d 419 (1961). Since possession of an object involves the power to control and intent to control, knowledge of the nature of the object must necessarily precede the intent or the exercise of such control. It must be emphasized that the only knowledge required is the knowledge of the nature of the object possessed; knowledge or lack of knowledge that the possession is illegal is immaterial.[4]

---

[4]The defendant in *United States* v. *International Minerals & Chemical Corp.*, 402 U. S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971), was charged with "knowingly" violating a regulation relating to the interstate shipment of sulfuric acid. The shipper contended that it could not be convicted unless the prosecution showed its knowledge of the regulation. Mr. Justice Douglas, in writing for the majority, rejected this argument and emphasized that a guide in determining whether the requirements of due process shall overrule Congress' power to regulate the distribution of a product,

The requirement of a conscious possession of contraband safeguards the name and reputation of the individual in whose building, automobile, luggage or clothing are found liquor, narcotics or similar commodities which were surreptitiously placed there by another. *State* v. *Labato, supra.* In *Bennett Chevrolet Co.* v. *Bankers & Shippers Ins. Co.*, 58 R. I. 16, 190 A. 863 (1937), it was pointed out that the word "possession" has a variety of meanings and since we are dealing here with "possession," as used in criminal statutes, we must abide by the well-settled rule that requires a strict construction of its terms. The requirement of a knowing possession of a central nervous stimulant or barbiturate satisfies this mandate. Proof of the knowledge[5] which is essential to conviction may be shown by evidence of acts, declarations or conduct of the accused from which an inference may be fairly drawn that he knew of the existence of narcotics at the place where they were found. *Peo-*

---

depends upon the type of product involved. He contrasted the sale of drugs (*Balint*), the possession of hand grenades (*Freed*) and the interstate transportation of corrosive acids with regulations that might relate to "pencils," "dental floss" or "paper clips." It was stressed that when an individual possesses or deals with a dangerous or deleterious device or product, he "must be presumed" to be aware of its regulation. The dissent took the position that Congress intended proof of the knowledge of the regulation was essential before a conviction could be sustained.

[5] A compilation of the two views regarding the necessity of a conscious possession of a narcotic drug is found in 91 A.L.R.2d 810. The view we have taken is followed in most jurisdictions. Massachusetts imposed criminal sanctions on the unaware possessor. *Commonwealth* v. *Lee,* 331 Mass. 166, 117 N.E.2d 830 (1954). The Supreme Judicial Court recognized the majority rule but followed the rationale set out in *Commonwealth* v. *Mixer,* 207 Mass. 141, 93 N.E. 249 (1910), where the defendant was held criminally liable for the transportation of barrels of liquor even though he was unaware of the nature of his cargo. Later, in *Commonwealth* v. *Buckley,* 354 Mass. 508, 238 N.E.2d 335 (1968), the court, in acknowledging the due process admonition given by the United States Supreme Court, ruled that a conviction based on an indictment which charged the defendant with being present where a narcotic drug was kept could not be sustained unless it was shown he knew of the presence of the drug.

*ple* v. *Wilson,* 46 Ill.2d 376, 263 N.E.2d 856 (1970); *State* v. *Faircloth,* 181 Neb. 333, 148 N.W.2d 187 (1967).

Even though, as noted earlier, §21-29-3(d) carries with it no statutory presumption that possession of amphetamine can be considered as evidence of knowledge, possession of a proscribed substance can give rise to the inference that the possessor knows what he possesses, especially if it be in his hands, on his person, in his vehicle, or on his premises. *People* v. *Reisman,* 29 N.Y.2d 278, 277 N.E.2d 396 (1971). This principle is particularly applicable when the substance is a narcotic, a drug, an amphetamine or a barbiturate whose use and distribution is strictly regulated by law. Possession of any of these items may, in absence of other facts and circumstances, be sufficient to sustain a conviction for unlawful possession. *People* v. *Nettles,* 23 Ill.2d 306, 178 N.E.2d 361 (1961).

## The Testimony

Gilman's exception to the denial of his motion for a directed verdict and his motion for a new trial raises the issue of the sufficiency of the evidence adduced by the state to support each charge. When a motion for a directed verdict is made in a criminal case, the trial justice must review the evidence in a light most favorable to the prosecution, not weighing the evidence or assessing credibility, but rather he must draw from the evidence all reasonable inferences which point to the guilt of the accused. On a motion for a new trial, however, the trial justice weighs the evidence and analyzes it in the light of his more comprehensive judgment to determine if the evidence reasonably supports the verdict. If it does, he affirms the verdict, and if it does not, he orders the new trial.

Here, the state's evidence gave rise to an inference that Gilman had knowing possession of the amphetamine, or a portion thereof, during the time it was being split up and bagged. The crime of possession does not depend on the

duration of the time one has the contraband under control. At the moment the "speed" was bagged, he had exercised the necessary power and control which is proscribed by the statute. *Peachie* v. *State*, 203 Md. 239, 100 A.2d 1 (1953); *Commonwealth* v. *Harvard*, 356 Mass. 452, 253 N.E.2d 346 (1969); *Sutton* v. *State*, 170 Tex. Crim. 617, 343 S.W.2d 452 (1961).

In considering the conspiracy indictment, it must be kept in mind that the gist of a conspiracy is the unlawful combination of two or more persons to do an unlawful act or a lawful act for an unlawful purpose with the offense being complete once the agreement is made. *State* v. *Edwards*, 89 R. I. 378, 153 A.2d 153 (1959); *State* v. *Bacon*, 27 R. I. 252, 61 A. 653 (1905). Anyone, knowing of the conspiracy, who intentionally takes part in or does any act to further the illegal agreement becomes a participant in the conspiracy. *State* v. *Bellin*, 55 R. I. 374, 181 A. 804 (1935).

Furthermore, there need not be any evidence that participants came together and expressly agreed to pursue a common design. *State* v. *Main*, 94 R. I. 338, 180 A.2d 814 (1962); *Abeyta* v. *People*, 156 Colo. 440, 400 P.2d 431 (1965). It is enough if they knowingly engage in a mutual plan to do a forbidden act. Conspiracy can rarely be proven by direct evidence. The illegal confederacy may be inferentially established by proof of the relation, conduct, circumstances and acts of the parties. *State* v. *Holmes*, 160 Conn. 140, 274 A.2d 153 (1970); *People* v. *Brinn*, 32 Ill.2d 232, 204 N.E.2d 724 (1965), cert. denied, *Clements* v. *Illinois*, 382 U. S. 827, 86 S.Ct. 62, 15 L.Ed.2d 72 (1965); *Kelley* v. *State*, 12 Md.App. 251, 278 A.2d 87 (1971); *Commonwealth* v. *Batley*, 436 Pa. 377, 260 A.2d 793 (1970).

The state's evidence showed that Gilman initiated the trip from North Kingstown to Narragansett. They arrived at the Greene residence where present were those in whose

company he had been seen on previous occasions. The undercover agent had observed Gilman present at an earlier sale of "speed." Gilman was portrayed as a willing and active participant in the dividing and bagging operation. He vouched for the agent's reliability and gave his assent to the ultimate sale. Taking the evidence in its totality, we believe that, notwithstanding Gilman's complaint that there is no evidence to show that he shared in the $20 paid to King, the jury was justified in finding that Gilman was part and parcel of a common scheme to make an unlawful delivery of "speed" to the undercover agent. It is not necessary to show that a conspirator has benefited before liability can attach. *State* v. *Bacon, supra.*

The defendant concludes this phase of his appeal by pointing out that the conspiracy indictment contains a wrong date. It is uncontroverted that the sale of the amphetamine to the inspector occurred at the Greene residence on December 10, *1968.* The indictment, however, alleges that the conspiracy occurred on December 10, *1969.* The typist's failure to strike the "8" key is not fatal.

The indictment which charges Gilman with the unlawful possession of amphetamine bears the correct date. The Grand Jury returned both indictments on April 30, *1969.* Section 12-12-10 states that a defendant shall not be acquitted or discharged because of an "immaterial mistake" in a complaint or an indictment. This typographical error falls squarely within the statute.

## The Charge

We come now to the issue of entrapment, a subject which has never been discussed by this court.[6] The doctrine is

---

[6]The closest this court came to acknowledging this doctrine was in *Tripp* v. *Flanigan*, 10 R. I. 128 (1871). Tripp was the City Treasurer. He sued on a bond given by Flanigan, a liquor dealer. The breach was a Sunday sale of "spirituous liquor" to a police officer who had been sent to Flanigan's establishment to buy what Flanigan was selling. Flanigan

well-recognized and established both in the federal and most state courts. *Sherman* v. *United States*, 356 U. S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells* v. *United States*, 287 U. S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *State* v. *Campbell*, 110 N. H. 238, 265 A.2d 11 (1970); Perkins, *Criminal Law*, chap. 10, sec. 9 at 1031 (2d ed. 1969); Am. Law Institute, *Model Penal Code* §2.10 (Tent. draft. No. 9). It is time that we join the judicial mainstream and recognize this doctrine as part of our law. The general rule has been set forth with unusual clarity by Professor Perkins at 1031 where he states:

> "Entrapment, so-called, is a relatively simple and very desirable concept which was unfortunately misnamed with some resulting confusion. It is socially desirable for criminals to be apprehended and brought to justice and there is nothing whatever wrong or out of place in setting traps to catch those bent on crime; what the state cannot tolerate is having its officers, who are charged with the duty of enforcing the law, instigate crime by implanting criminal ideas in innocent minds and thereby bringing about offenses that otherwise would never have been perpetrated."

Entrapment[7] is an affirmative defense. In determining whether entrapment has been established, a line must be drawn between "the trap for the unwary innocent and the trap for the unwary criminal." *Sherman* v. *United States*, *supra*. Mere solicitation on the part of the police does not in and of itself constitute entrapment. *Kadis* v. *United States*, 373 F.2d 370 (1st Cir. 1967). Artifice and stratagem

---

argued that because of the police officer's actions, the treasurer should be "estopped" from proceeding with the suit. This defense was brushed aside by the court's comment that there was no evidence that the sale had been induced by anything the officer said or did.

[7] An oft-cited definition of entrapment is found in *People* v. *Neal*, 120 C.A.2d 329, 261 P.2d 13 (1953), where the court described entrapment as "* * * the conception and planning of an offense by an officer and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer."

may be employed to apprehend those engaged in crime. *Sorrells* v. *United States, supra.* The illicit trafficking in drugs and narcotics is usually carried on in furtive fashion. Without the diligent efforts of individuals, such as the undercover agent in the case at bar, few, if any, violators would be uncovered.

The trial justice instructed the jury on the law of entrapment. The jury returned for further instructions on this subject. The trial justice then read a portion of 21 Am. Jur.2d *Criminal Law* §§143 and 144 (1965). The defendant took no exception to any of the explanation given the jury. A bench conference ensued and then the trial justice returned to "Am. Jur." and made the following observation:

> "Now there is this further language in this same text, which says that: 'The defense of entrapment is not available to one who denies commission of the offense since the invocation of such defense necessarily assumes that the act charged was committed.' "

The defendant took exception to this portion of the charge and contends that the defense of entrapment should be available to him even though he denies committing the crime.

The majority view supports the trial justice's instructions. *United States* v. *Pickle,* 424 F.2d 528 (5th Cir. 1970); *Garibay-Garcia* v. *United States,* 362 F.2d 509 (9th Cir. 1966); *Brown* v. *State,* 248 Ark. 561, 453 S.W.2d 50 (1970); *State* v. *Avery,* 152 Conn. 582, 211 A.2d 165 (1965); *People* v. *Calcaterra,* 33 Ill.2d 541, 213 N.E.2d 270 (1966); *State* v. *Dennis,* 43 N. J. 418, 204 A.2d 868 (1964); *State* v. *Garcia,* 79 N. M. 367, 443 P.2d 860 (1968). The court's rationale is that the cry of "entrapment" is incompatible with the defendant's claims that he did not do the acts constituting the offense charged. Entrapment, it is said, loses all meaning unless the acts charged are admitted by the defendant.

222

On the other hand, Gilman's argument finds support in *People* v. *Perez*, 62 Cal.2d 769, 401 P.2d 934 (1965), where the court, in overruling former cases which had adhered to the view cited above stated, "To compel a defendant to admit guilt as a condition to invoking the defense of entrapment would compel him to relieve the prosecution of its burden of proving his guilt beyond a reasonable doubt at the risk of not being able to meet his burden of proving entrapment. To put defendant in that dilemma would frustrate the assertion of the defense itself and would thus undermine its policy." *See also Hansford* v. *United States*, 303 F.2d 219 (D.C. C.A. 1962); *Henderson* v. *United States*, 237 F.2d 169 (5th Cir. 1956).

We need not make a choice. This particular issue is usually presented because of the trial justice's failure to give a charge on entrapment where the defendant categorically denies the crime. In our case, the trial justice gave an extensive charge on entrapment. It is our belief that Gilman received more than he deserved.

Since entrapment is an affirmative defense, it was Gilman's burden to present some evidence[8] which required the trial justice to cover this subject in his charge. No such evidence was adduced. Gilman told the jury that he had been invited by his friend and the agent to take the ride to Narragansett. It was his friend, he said, who brought up the subject of marijuana. The defendant attributed the ride to Narragansett to the agent's belief that he (the agent) could locate some "grass" there. Though Gilman stated that several times the agent asked him if he knew any location where the narcotic could be found, the de-

---

[8]When a defendant claims entrapment, the burden is upon him to prove the same by a fair preponderance of the evidence. This is the burden imposed on a defendant who seeks to excuse his conduct on the grounds of lack of criminal responsibility. *State* v. *Jefferds*, 91 R. I. 214, 162 A.2d 536 (1960). We see no reason why the same rule should not apply when a defendant claims he was entrapped.

fendant testified, "I told him that I didn't know of anyone that had any." There is absolutely nothing in Gilman's testimony to show that he had succumbed to the blandishments of the undercover agent. The gratuitous instructions given in this case had no evidentiary basis upon which a finding of entrapment could rest. It is obvious that when the jury finally returned to its deliberations, it was confronted with the only issue raised by the evidence: Whose story was to be believed, the agent's or Gilman's? If the trial justice's last reference to "Am. Jur." was error, it was harmless. Harmless as it was, it served to focus the jury's attention on the only issue properly before it. The defendant's exception to the charge is overruled.

In each case, the defendant's exceptions which have been briefed and argued are overruled. All other exceptions are deemed to have been waived and the cases are remitted to the Superior Court.

*Richard J. Israel*, Attorney General, *R. Raymond Greco*, Special Asst. Attorney General, for plaintiff.

*Aram K. Berberian*, for defendant.