345 A.2d 871.

IN RE ROBERT A. CALDARONE.

IN RE JOHN R. LOMBARDI.

OCTOBER 8, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

PAOLINO, J. The defendant Robert A. Caldarone was tried before a jury in the Superior Court on a three-count indictment charging him with unlawful possession of a barbiturate, in violation of G. L. 1956 (1968 Reenactment) §21-29-3(d); unlawful possession of heroin, in violation of §21-28-3; and unlawful possession of a hypodermic needle and syringe, in violation of §21-28-33.[1] On March 14, 1973, the jury returned a verdict of guilty on all counts. On June 27, 1973, the trial justice denied the defendant's motion for a new trial, imposed a 2-year suspended sentence, and placed the defendant on probation for 2 years on each count. The sentences and probation were concurrent for all three counts. Judgment of conviction was entered on the same day. On September 28, 1973, the defendant filed a notice of appeal in each indictment.[2]

---

[1] The subject matter of these indictments is now covered by the Uniform Controlled Substances Act, G. L. 1956 (1968 Reenactment) tit. 21, ch. 28, as amended by P. L. 1974, ch. 183, §2.

[2] It is undisputed that this notice of appeal was not timely since Sup. Ct. Rule 4(b) provides that notice of appeal must be filed within 20 days of the judgment or order appealed from.

The defendant John R. Lombardi was tried together with defendant Caldarone on three separate indictments charging the same offenses as those against defendant Caldarone. On June 27, 1973, the trial justice denied his motion for a new trial in each indictment and placed him on probation for 2 years on each charge. On the same day a judgment of conviction was entered in each case in the Superior Court. On September 28, 1973, defendant filed a claim of appeal in each indictment.[3]

In October 1973 each defendant filed a document in this court entitled "Petition for Writ of Habeas Corpus."[4] Each petition alleges that on June 27, 1973, each defendant made a claim that he was indigent and that each case was referred to the office of the public defender for the purpose of determining his indigency and prosecuting the appeal; that each defendant's counsel was notified on June 27, 1973 that the notice of appeal would be filed forthwith; that the public defender's office then determined that each defendant was ineligible for its services; and that the notice of appeal was not timely filed and each defendant wished to pursue his appeal.

On October 30, 1973, we entered an order directing the state to file an answer in each case in accordance with Sup. Ct. R. 14 and to show cause why the writ should not issue as prayed.

In its answer the state alleges that a petition for habeas corpus is not the proper vehicle to petition this court to allow appellate proceedings out of time; that there is no way in which a defendant can petition this court for such relief since G. L. 1956 (1969 Reenactment) §9-21-6, re-

---

[3]*See* note 2, *supra*.

[4]These cases were tried together in the Superior Court. Since the issues are the same, we shall treat them as one but our conclusions shall apply equally to both cases.

lating to allowance of appellate proceedings after the time expiration, was repealed by P. L. 1972, ch. 169, §7, and there is no provision in the new rules for filing notice of appeal out of time;[5] that even if we thought that a case of this type was important enough to suspend our rules under Sup. Ct. R. 2,[6] there should be some showing of accident, mistake, unforeseen cause, or excusable neglect as was required under former §9-21-6.

The state further alleges in its answer that the Attorney General's department was informed by the public defender's office that it sent a letter to each petitioner informing him that the public defender's office would not represent him because he was not indigent; that each petitioner therefore was aware on or about July 11, 1973 that the public defender would not represent him; and that in the circumstances each petitioner would have had an opportunity to file his notice of appeal if he had acted with dispatch before the expiration date of July 17, 1973.

On January 9, 1974, we entered an order consolidating the two petitions. *In re Caldarone, In re Lombardi*, 112 R. I. 937, 313 A.2d 666 (1974). After noting that it appeared petitioners' rights to appeal had "been lost because of some incident for which they were not responsible," we treated the petitions as petitions for certiorari and granted the same without prejudice to the state's right

---

[5]Public Laws 1972, ch. 169, §7 has been superseded by G. L. 1956 (1969 Reenactment) §9-21-6, as amended by P. L. 1973, ch. 204, §1, which allows an appeal to be taken within 90 days where there is a showing of accident, mistake, unforeseen cause, or excusable neglect, and if it appears that justice so requires.

[9]Supreme Court Rule 2 reads as follows:

"In the interest of expediting decision, or for other good cause shown, the Supreme Court may suspend the requirements or provisions of these rules on application of a party or on its own motion and may order proceedings in accordance with its direction."

to raise at oral argument the question of the impropriety of the issuance of the writs.

I

Initially we address ourselves to the procedural question raised by the state's contention that there is no way in which a defendant can petition this court for permission to file appellate proceedings out of time since the repeal of §9-21-6. The state, in making this argument, has presented no case or authority of any kind to support its position and in the light of the cases we cite, we do not believe that it could do so.

This court has granted certiorari to review a case where it appeared that the right of appeal has been lost because of illness or some accident for which the petitioning party was not responsible. *Hester* v. *Timothy,* 108 R. I. 376, 275 A.2d 637 (1971); *MacKenzie & Shea* v. *Rhode Island Hospital Trust Co.,* 45 R. I. 407, 122 A. 774 (1923). As we said in *Hester* v. *Timothy, supra,* while the Legislature may limit, restrict, or deny a party access to this court, it cannot divest this court of power to review decisions of subordinate tribunals by way of the discretionary common-law writ of certiorari. *See also Smith* v. *Estate of Catterall,* 107 R. I. 729, 271 A.2d 300 (1970); *In re Little,* 103 R. I. 301, 237 A.2d 325 (1968); *Nocera Bros. Liquor Mart, Inc.* v. *Liquor Control Hearing Board,* 100 R. I. 644, 218 A.2d 659 (1966). Further, this court has issued the writ in the exercise of its revisory and appellate jurisdiction to correct alleged errors of law where it appeared that serious hardship was likely to result to the aggrieved party if his only recourse were the normal remedy of appeal. *Dyer* v. *Keefe,* 97 R. I. 418, 198 A.2d 159 (1964); *McCoy* v. *Nolan ex rel. Providence Journal Co.,* 74 R. I. 464, 62 A.2d 330 (1948); *White* v. *White,* 70 R. I. 48, 36 A.2d 661 (1944). While *Dyer* involved a constitutional question, *McCoy* and *White* did not. The

state has failed to persuade us that this court lacks power, in the exercise of its discretion, to issue the writ and to review alleged errors of law therein in a case such as this. The question remains whether our action in granting the writ in this case was improvident. The state argues in substance that this court needs

> "* * * more information concerning accident, mistake, unforeseen cause or excusable neglect in order to decide whether or not to grant the petitioner permission to file an appeal out of time."

We do not agree with the state's argument on this issue. We are satisfied that the record supports our original conclusion that petitioners' rights to appeal were lost because of some incident for which they were not responsible. Accordingly, we shall exercise our appellate function by way of certiorari to review the action below and determine whether any of the alleged errors constitute reversible error.

## II

We now address ourselves to the merit of the substantive issues raised by petitioners. The pertinent facts are as follows. On August 25, 1971, at approximately 2:40 p.m. Warwick police officers entered a densely wooded lot behind a "7-11" store on Warwick Neck Avenue. In the center of that wooded area is a clearing estimated at 10 to 15 feet in diameter. When the police first arrived a group of men (some seven in number), including petitioners, were in the clearing behind the "7-11" store. Some of the men were standing; others were sitting or crouching. As the police approached, one of the men shouted, "Screw, it's the cops!" whereupon they all ran. All men were apprehended and arrested.

Following their arrest the officers seized certain articles which they found around the rocks in the center of the clearing. The articles seized included the following: a

white glassine bag, which was later discovered to contain heroin, on the top of the rock; a Marlboro cigarette box with two needles and syringes in it; a tissue which appeared to have blood on it; some bottle-cap cookers; and some capsules of Tuinal, which were later discovered to contain barbiturates.

The petitioners have briefed and argued eight main issues. However, under the view we take of the case it is necessary to consider only the issue of the trial justice's denial of defendants' motion for judgment of acquittal. For the reasons that follow we hold that the trial justice erred in denying petitioners' motion of acquittal at the close of all the evidence.

At the close of the state's case petitioners moved for a judgment of acquittal which was denied by the trial justice. No objection lies to its denial. *State* v. *Franklin*, 103 R. I. 715, 729, 241 A.2d 219, 228 (1968). We are concerned here only with the denial of the motion of acquittal which petitioners made at the close of their own case pursuant to Super. R. Crim. P. 29. Although Rule 29 abolished motions for directed verdicts, the standard to be applied to motions for judgment of acquittal is the same as that previously used in passing on a motion for a directed verdict. The trial justice must view the evidence in the light most favorable to the state, give full credibility to the state's witnesses, and draw from the evidence every reasonable inference consistent with guilt. *State* v. *Moretti*, 113 R. I. 213, 215, 319 A.2d 342, 343 (1974).

It may be helpful to point out at this time that although the charged violations involve different statutes, they all involve the question of possession, actual or con-

structive.[7] In the posture of this case, that is, in determining the question of the correctness of the trial justice's denial of petitioners' motions for judgments of acquittal, the narrow question before us is whether there is any evidence in this record, direct or circumstantial, from which inferences could be drawn, which, if believed and if viewed in the light most favorable to the state, would support the trial justice's conclusion that there was sufficient evidence to go to the jury on the question of possession.

The petitioners argue now, as they did before the trial justice, that there is not sufficient evidence in this record, direct or inferential, which, if believed, would support the charges of possession, even if viewed in the light most favorable to the state. They contend that the evidence does not meet the standards set forth by this court in *State* v. *Motyka,* 111 R. I. 38, 40-41, 298 A.2d 793 (1973); *State* v. *Fortes,* 110 R. I. 406, 408-10, 293 A.2d 506 (1973); and *State* v. *Gilman,* 110 R. I. 207, 215, 291 A.2d 425 (1972).

The state, on the contrary, argues that the evidence satisfies the standards set forth in *State* v. *Gilman, supra,* and that the evidence, when viewed under the standards set forth in *State* v. *Moretti, supra,* was sufficient to warrant a reasonable inference of conscious constructive possession by petitioners of the articles in question. The state further argues that *Motyka* and *Fortes,* both *supra,* are factually and materially distinguishable from the case at bar and, therefore, are of no help to petitioners.

A reading of the trial justice's ruling denying petitioners' motions shows that she was cognizant of her duties in passing on such motions. She carefully reviewed the

[7] *See* former G. L. 1956 (1969 Reenactment) §§21-28-3, 21-28-33, 21-29-3 before their amendment by G. L. 1956 (1969 Reenactment) tit. 21, ch. 28, as enacted by P. L. 1974, ch. 183, §2.

pertinent evidence consistent with her duties. She then discussed at some length our decisions in *Fortes* and *Gilman,* and, in so doing, pointed out that those cases were factually different from the case at bar. After stating that it was her duty to determine whether the evidence before her met the tests set forth in *Fortes* and *Gilman,* she said:

> "I think that the capsules, the needles and the syringe and the cookers which were in plain sight take this case right out of the strictures set down by *Fortes* and *Gilman,* and I think especially in view of the cry by one of these men that the police were there and their flight, the fact that it was daylight, and the fact that they were all within a circle of what appeared to be a circle surrounding this rock where these things were found or the general area in which they were found convinces me that if believed there is sufficient evidence to go to the jury. As I say, I don't rule on credibility."

As we have previously indicated, the narrow issue here is whether there is sufficient evidence in this record to meet the tests laid down in *Gilman.* Therein we held that the word "possess" when used in a criminal statute means an intentional control of a designated object with knowledge of its nature and that proof of the knowledge which is essential to conviction may be shown by

> "* * * evidence of acts, declarations or conduct of the accused from which an inference may be fairly drawn that he knew of the existence of narcotics at the place where they were found." *Id.* at 216, 291 A.2d at 431.

We applied the *Gilman* standards in *State* v. *Fortes, supra.* Fortes was tried before a Superior Court justice sitting without a jury on an indictment charging him with unlawful possession and control of a barbiturate. The contraband was found in an automobile which was neither owned nor operated by Fortes, who was a passenger therein. The car was being operated by a woman companion

whose husband was the registered owner of the motor vehicle. Two police officers recognized it as an automobile previously parked near a residence which was under police surveillance because it was frequented by " 'narcotics users, pushers, prostitutes, and * * * gamblers * * *.' " *Id.* at 407, 293 A.2d at 507. They also identified the passenger in the vehicle as Fortes, a person believed to be a user and pusher of drugs. They pursued the vehicle but were unable to overtake it until it skidded into a snowbank and came to rest. The officers then approached and ordered both the operator and Fortes to get out of the vehicle. As they alighted one of the officers examined the interior of the vehicle and observed two tablets in the bucket seat just vacated by Fortes. The defendant was frisked, but no drugs or weapons were found on his person. He was arrested.

On the basis of the foregoing evidence, the trial justice found him guilty of possession of barbiturates. We reversed because in our judgment the evidence was insufficient to support a finding of guilt. After noting that the record contained no direct evidence which satisfied the *Gilman* standards, we said:

> "While there is ample testimony from which a fact finder could rationally conclude that defendant consciously possessed or intentionally controlled the pills there is no evidence whatsoever in that record which reasonably yields to the inference that defendant knew that the pills were barbiturates. Thus, an inference to that effect would, on this record, be conjectural and speculative, rather than reasonable and rational, and proof based solely on conjecture and speculation will not support a conviction." *Id.* at 408-09, 293 A.2d at 508.

The rationale of this court in *Fortes* is, by analogy, applicable to the case at bar. Here too, a search of the record fails to disclose any direct evidence which satisfies the *Gilman* standards. The possession here, if any, is con-

structive, not actual. As we said in *State* v. *Motyka, supra* at 40-41, 298 A.2d at 794:

> "Constructive possession arises where an individual has dominion or control over an object although it may not be within his immediate physical possession."

While there is ample evidence in the record from which a factfinder, viewing the evidence in the light most favorable to the state, could rationally conclude that one or more of the persons present when the police arrived consciously possessed or intentionally controlled the articles found at the scene, there is no evidence whatsoever in that record which reasonably yields to the inference that either of these petitioners consciously possessed or intentionally controlled the articles in question, whether in plain view or not, by their mere presence there. Thus, as was the situation in *Fortes,* an inference to that effect would, on this record, be merely conjectural and speculative, rather than reasonable and rational, and proof based on conjecture and speculation will not support a conviction.

If mere presence at the place where the contraband was found is not sufficient to meet the *Gilman* standard, does the fact that all those present began to run when the police arrived supply the missing link? We do not believe that it does. Evidence of flight may be introduced as a circumstance bearing on the question of guilt which may be presented for the consideration of the jury. *State* v. *Ouimette,* 110 R. I. 747, 774, 298 A.2d 124, 139-40 (1972); *State* v. *Falcone,* 41 R. I. 399, 401, 103 A. 961 (1918).

But, evidence of flight is only one circumstance. The question here is whether, when combined with the petitioners' presence at the place where the contraband was found, an inference could be fairly drawn that either petitioner had possession of the articles found, that is, intentional control of those articles. We do not believe that such an inference could be reasonably or rationally drawn. In our judgment, such an inference would, on this record,

be conjectural and speculative, rather than reasonable and rational, and therefore would not support a conviction.

For the reasons stated, we hold that there is no evidence in this record, direct or reasonably inferable, which, if believed and viewed in the light most favorable to the state, would support the trial justice's conclusion that there was sufficient evidence to go to the jury on the question of possession.

In each case the petition for certiorari is granted, the judgment of conviction is quashed, and the case is remanded to the Superior Court for entry of judgment of acquittal.

Mr. Justice Joslin, concurring. My brothers and I agree that the record in this case contains no direct evidence of petitioners' or anybody else's guilt. We disagree, however, on that record's inferential potential for determining who among those present at the scene when the police arrived can reasonably be said to have consciously possessed or intentionally controlled the contraband.

The majority say that it is conjectural or speculative, rather than reasonable or rational, to ascribe that possession or control to petitioners.[1] My brother Kelleher rejects that view. In his opinion the evidence reasonably yields to the inference that all those present at the scene were joint constructive possessors. I agree with his conclusion, but go further. In my judgment it is equally as reasonable to infer that less than all those present were pos-

---

[1]The majority rely heavily for their conclusion on *State* v. *Fortes,* 110 R. I. 406, 293 A.2d 506 (1972). That case, however, is clearly distinguishable because (1) the inference which we refused to draw in that case did not relate to possession, but was concerned solely with whether the accused knew that the contraband pills were barbiturates; (2) the question of the appropriate rule to be applied on a motion for judgment of acquittal was not considered; and (3) the decisive issue was the appropriate test for determining what quantum and quality of circumstantial evidence is required in order to sustain a conviction.

sessors, that some were innocent bystanders, and that the latter group could have included one or both of petitioners.

If I am correct in my view that the evidence is susceptible of inconsistent, but equally reasonable, inferences, application of the rule requiring direct and inferential evidence to be viewed most favorably to the state on a motion for judgment of acquittal would perforce dictate denial of that motion. But to adhere to that rule in this scenario would result in an anomaly. This is so because on the same record application of the so-called circumstantial evidence rule[2] would require a conviction to be set aside on the ground that the facts and circumstances of the case, though consistent with guilt, fail to preclude a reasonable hypothesis of innocence.[3] This anomaly and the consequent needless protraction of litigation can be avoided by following the rule of *State* v. *Rose,* 112 R. I. 402, 407-08, 311 A.2d 281, 284 (1973).[4] In that case the

[2]*State* v. *Fortes,* 110 R. I. 406, 409, 293 A.2d 506, 508 (1972); *State* v. *Franklin,* 103 R. I. 715, 725, 241 A.2d 219, 225-26 (1968); *State* v. *Montella,* 88 R. I. 469, 476, 149 A.2d 919, 922-23 (1959); *State* v. *Blood,* 68 R. I. 160, 162, 26 A.2d 745, 746 (1942); *State* v. *Di Noi,* 59 R. I. 348, 368, 195 A. 497, 506 (1937).

[3]The anomaly referred to is highlighted by *State* v. *Montella,* 88 R. I. 469, 149 A.2d 919 (1959). There, four polling officials were charged with conspiracy to violate the election laws. The evidence was circumstantial and like that in the instant case was susceptible of inferences that all or less than all of the defendants had participated. On that record the court held that (1) the defendants' motions for directed verdicts should have been denied because the inferential evidence viewed most favorably to the state would support a finding of guilt, and (2) their motions for new trials should have been granted because the evidence was consistent with a reasonable conclusion other than that of guilt.

[4]An alternative method of avoiding the inconsistency would be to follow the lead of the federal courts which have rejected our rule for testing the sufficiency of circumstantial evidence in support of a conviction. *See State* v. *Fortes,* 110 R. I. 406, 409 n.2, 293 A.2d 506, 508 n.2 (1972.)

inference most favorable to the state pointed to guilt. Notwithstanding, we held that the motion for a judgment of acquittal should have been granted because the evidence failed to exclude a reasonable hypothesis of innocence. The situation here is no different. Hence, the trial justice should have ordered the entry of a judgment of acquittal of the offense charged, but not for the reasons advanced by the majority.

Mr. Justice Kelleher, dissenting. It is fundamental law that the possession sufficient to sustain a conviction for the possession of narcotics, or narcotic paraphernalia may be constructive rather than actual, joint rather than exclusive, and the proscribed possession may be established by circumstantial rather than direct evidence. D. Bernheim, *Defense of Narcotic Cases,* §1.11[3] (1975); Annot., 91 A.L.R.2d 810, §§3 and 4 (1963), and Annot., 56 A.L.R. 3d 948 (1974).

For purposes of the motion for a judgment of acquittal, the evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the prosecution. Two elements essential to proof of a joint constructive possession are the power of control and intent to exercise that control. *Commonwealth* v. *Townsend,* 428 Pa. 281, 237 A.2d 192 (1968). While presence in the vicinity of contraband does not by itself prove the crime of possession, knowledge of its presence and intent to exercise control can be inferred from the totality of the circumstances of which presence is a factor. With these principles in mind, let us review the evidentiary chain of circumstances forged by the prosecution.

The gist of one witness' testimony bears repeating. He is Detective Victor E. Thatcher, a 7-year veteran of the Warwick Police Department's Narcotic Unit. He has participated in around 70 narcotic raids. He spoke in the jargon of a narcotic user. The bottle caps he called

330

"cookers." The caps are of the "twist-off" variety. The witness told how a user would pull a piece of the cap away from the body of the cap. The torn piece would then serve as a handle for the cooker. Into the cooker are placed cotton, heroin, and spring water. The user holds the cooker by the handle with one hand and with the other hand he holds a match to the bottom of the cooker to heat up the solution. Once the solution reaches the right temperature, the hypodermic paraphernalia are used to draw off the solution through the cotton into the syringe. The solution is then injected into the user's body. Officer Thatcher reported that the draw-off through the cotton and the use of spring water are employed to purify the product. He also explained that the Tuinal can be removed from its capsules, placed in the cooker where it is mixed with the water, and, once heated, it can be administered intravenously.

With Detective Thatcher's narrative providing the background, picture the petitioners and five others gathered together in a secluded area which cannot be seen from the adjoining streets. In the area where the septet are assembled can be seen a glassine packet of heroin, 53 capsules of Tuinal, hypodermic needles and syringes, the cookers, a jug of spring water, and a blood-stained piece of tissue paper. When the police arrive, the seven try to escape.

Looking at all the evidence, one can reasonably infer that the hideaway selected by petitioners and their companions was a "shooting gallery," i.e., a place where heroin users gather to take drugs by the needle.[1] The blood-stained tissue paper indicates that the "shooting" was

---

[1] While the description of the bottle caps as "cookers" came from Detective Thatcher, the definition of "shooting gallery" comes from a glossary of terms found in D. Bernheim, *Defense of Narcotic Cases*, §7:34 (1975).

underway before the police arrived. At the approach of the police, the petitioners and their companions "took off"; flight is a well-recognized indication of guilt. The plain-view presence of the contraband, the group's choice of a secluded assembly point, and their attempt to flee once they were aware that the police were on the way to join them, indicate that each person present had the right and the intent to use all of the contraband that was there spread out before them.

When a realistic appraisal is made of all these factors, with consideration of Detective Thatcher's testimony, there arises a reasonable inference that the petitioners and their companions were in the joint constructive possession of the contraband spelled out in each of the three indictments for which they were tried.

Since the weight to be given such an inference is not before the trial justice on a motion for acquittal, there was sufficient evidence to take the case to the jury.[2]

*Julius C. Michaelson,* Attorney General, *William G. Brody,* Special Asst. Attorney General, for State of Rhode Island.

*Bevilacqua & Cicilline, John F. Cicilline,* for defendants.

---

[2]The motion for acquittal is the equivalent of what was in the years prior to the adoption of the Superior Court Rules of Criminal Procedure a motion for a directed verdict. *State* v. *Moretti,* 113 R. I. 213, 319 A.2d 342 (1974). In *State* v. *Montella,* 88 R. I. 469, 149 A.2d 919 (1959), this court upheld the denial of a motion for a directed verdict in a case charging a number of defendants with conspiring to violate the election laws, but then faulted the trial justice's denial of their motion for a new trial, pointing out that since the defendants' guilt rested entirely on circumstantial evidence, the evidence presented by the state failed to exclude any reasonable hypothesis but that of guilt.