**STATE**

**v.**

**Robinson BERROA.**

No. 2008–53–C.A.

Supreme Court of Rhode Island.

Nov. 1, 2010.

John E. Corrigan, Department of Attorney General, for State.

William C. Dimitri, Esq., Johnston, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

1. Aldous Huxley (1894–1963).

## OPINION

Justice FLAHERTY, for the Court.

"There are things known, and there are things unknown, and in between are the doors of perception."[1] Robinson Berroa appeals from a judgment of conviction by a trial justice, sitting without a jury, on three counts: (1) possession of a controlled substance with intent to deliver, (2) possession of one ounce to one kilo of a controlled substance, and (3) conspiracy to violate Rhode Island's Uniform Controlled Substances Act, G.L.1956 chapter 28 of title 21. After the state rested its case, the defense made an immediate motion to dismiss under Rule 29(b) of the Superior Court Rules of Criminal Procedure. The trial justice denied the motion, and, after the defendant rested without presenting a defense, the trial justice entered a judgment of conviction. For the reasons set forth below, we vacate the judgment of conviction.

### Facts

On November 6, 2003, Special Agent Brendan Hickey of the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) received a call from a confidential informant (informant) who previously had provided reliable information to him. The informant told Agent Hickey that a blue Dodge Intrepid bearing Massachusetts license plates was, or soon would be, arriving at T.F. Green International Airport in Warwick. The informant said that the driver would be a "Hispanic looking male, who had darker skin," from the New Bedford, Massachusetts area. The informant also told the agent that if the individual described was not behind the wheel, then he would be "at least in the vehicle." Significantly, the informant related to Hickey

that the driver would be picking up two Hispanic females traveling from the southwest corner of the United States. Also, the informant predicted that a fairly large amount of cocaine would be found in the vehicle, that there was an outstanding warrant for the arrest of the driver and, further, that he would be operating the vehicle even though his driver's license had been suspended. Finally, and ominously, the informant communicated that the person he expected to be operating the vehicle was known to carry weapons and that he would possibly have a weapon in the car.[2]

When he received the tip, Agent Hickey was in New Bedford, Massachusetts. Because he estimated that it would take between forty minutes and one hour for him to drive to T.F. Green, and further based upon his confidence about the information that had been provided to him, Hickey contacted Special Agent Wing Chau of the Providence office. The two agents shared a ten-year history, and Hickey thought Chau would have the resources at his disposal for a quick response. Although "short of agents," Agent Chau ably coordinated with the airport police and the Drug Enforcement Administration (DEA). He contacted Patrolman Phil Bouchard of the airport police and shared the information that he had received from Hickey. Then, Chau and two other agents—Special Agent Chris Jarden and Task Force Agent John Rabbit—headed to T.F. Green, a trip that took about twenty minutes.

After he received Chau's telephone call, Patrolman Bouchard passed the information on to other airport officers, including acting supervisor Officer Rick Stelle and day-shift supervisor Lieutenant Walter Salisbury. Bouchard then positioned himself so that he could see the entrance to the short-term parking lot. Specifically, the police were on the lookout for the blue

Dodge Intrepid with Massachusetts license plates about which he had been informed. At trial, Bouchard testified that he and the other airport police were warned that an outstanding warrant on the driver was possible and that weapons might be inside the vehicle; he was unaware of any specific information relating to drug interdiction.

Patrolman Bouchard's diligence soon was rewarded; after about ten minutes he spied a blue Intrepid with Massachusetts plates entering the short-term parking lot. After he contacted Officer Stelle, Bouchard then drove his cruiser to a crosswalk where he picked up Stelle before proceeding to the exit of the short-term lot. After waiting fifteen minutes or so, visual contact with the Intrepid resumed as the vehicle approached the parking lot's pay booth. As soon as the Intrepid exited the pay booth area and merged into the one-way roadway, Bouchard stopped the vehicle before it reached the airport connector leading to interstate Route 95. With his weapon drawn, Officer Stelle approached the stopped vehicle from the passenger side as Patrolman Bouchard advanced along the driver's side, his hand upon his unsnapped but still holstered weapon.

There were four occupants in the Intrepid—two men in the front seats and two women in the backseat. Patrolman Bouchard informed the driver that the vehicle had been stopped for investigatory reasons and that, in addition, the car had a wobbly right rear wheel. The driver was cooperative, and he produced his license and the vehicle's registration at the officer's request. The officers also requested identification from the male passenger in the front seat and the two women in the backseat. One woman presented an Arizona license, the other a passport. The male passenger could not produce any identify-

---

2. The informant did not provide a name to Agent Hickey.

ing documents but said his name was Edgar Camacho and his date of birth was November 17, 1985.[3]

Agents Chau and Hickey soon arrived. They were joined by law enforcement officers quickly converging from a variety of agencies. Agent David Toracinta testified that after he identified himself as a DEA agent, he approached the vehicle and spoke with the driver, Robinson Berroa, who asked him why he had been stopped. Agent Toracinta told him that an investigation was being conducted and that a law enforcement person would soon explain everything. Citing safety concerns, Toracinta removed defendant from the car, handcuffed him, and then walked him to the rear of the Intrepid. Toracinta also removed the women from the Intrepid and settled them in a grassy area some distance away.[4] At trial, Toracinta testified to certain of his on-scene observations that he believed indicated that defendant was nervous because he had something to hide. These observations consisted of a visible pulse at the left carotid artery of defendant's neck and, later, defendant looking at the ground and kicking at the grass, a behavior referred to by Toracinta as "the convict shuffle."

Task Force Agent Peter Brancato—attached to the Providence DEA office and a specialist in the use of narcotic-detecting dogs—soon arrived at the scene in an unmarked police cruiser with his dog Boris.

While doing "a walk around" of the vehicle with the animal, Agent Brancato advanced toward the "slightly ajar" rear passenger door. Once at the door Boris "indicated" on the car by scratching it. Agent Brancato continued the walk around and ultimately allowed Boris to enter the vehicle through the driver's door. Straightaway, Boris went to the rear seat and began smelling and then biting and scratching at one of the two purses left there by the women.

Agent Brancato opened the left rear door and ordered Boris to drop the purse and to continue the search. Boris similarly reacted to the second purse with biting and scratching. Brancato then searched the two purses and discovered that each contained a "cylinder-type object" heavily wrapped in cellophane and suspected to be holding cocaine. Agent Brancato left everything in place in the backseat of the car and notified Toracinta of what had been found. The contents of both cylindrical objects then were field-tested and positively identified as high-grade cocaine capable of pre-sale dilution.

### Standard of Review

■■■ "In a jury-waived criminal proceeding, a defendant may move to dismiss in order to challenge the legal sufficiency of the evidence." *State v. Harris*, 871 A.2d 341, 346 (R.I.2005) (citing *State v. Silvia*, 798 A.2d 419, 424 (R.I.2002)). "In ruling on such a motion, the trial justice

3. Patrolman Bouchard eventually investigated the identifications provided; specifically, the New York license provided by defendant, Robinson Berroa, an Arizona license provided by Norma Valle Alfaro, a Dominican passport provided by Iluminada Abrue, and the oral self-identification of Edgar Camacho, a minor from New Bedford, Massachusetts. The National Crime Information Center computers revealed that no outstanding warrants for arrests had been issued on the parties. Iluminada Abrue and Norma Valle Alfaro were named codefendants in the state's case but

fled after they were released on bail. They have not been found.

4. Although vague on this point, it appears from the testimony of Agent Toracinta that the fourth occupant, the male passenger from the front seat, already was seated in a police cruiser when Agent Toracinta removed the other occupants from the vehicle and helped secure them within the confines of a grassy area.

acts as the fact-finder." *Id.* (citing *State v. McKone,* 673 A.2d 1068, 1072 (R.I.1996)). "In carrying out that task, the trial justice is 'required to weigh and evaluate the trial evidence, pass upon the credibility of the trial witnesses, and engage in the inferential process, impartially, not being required to view the inferences in favor of the nonmoving party, and against the moving party.'" *Id.* (quoting *McKone,* 673 A.2d at 1072–73). "The trial justice must deny the defendant's motion to dismiss if he or she concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt." *Id.* (citing *McKone,* 673 A.2d at 1073).

■ On appeal of such a proceeding, this Court gives deference to a trial justice's findings of fact. *State v. Forand,* 958 A.2d 134, 138 (R.I.2008); *Harris,* 871 A.2d at 346. If the trial justice "concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt, he or she * * *, if both sides have rested, enters decision and judgment of conviction thereon." *McKone,* 673 A.2d at 1073. This Court will uphold the findings of a trial justice presiding over a criminal bench trial unless it can be shown that he overlooked or misconceived relevant and material evidence or was otherwise clearly wrong. *Forand,* 958 A.2d at 138; *Silvia,* 798 A.2d at 424; *McKone,* 673 A.2d at 1073; *see also State v. Traficante,* 636 A.2d 692, 694 (R.I.1994). In conducting our review, "[w]e are required to review the record carefully to see if it in fact contains sufficient evidence to support the trial justice's conclusion." *Harris,* 871 A.2d at 346; *accord McKone,* 673 A.2d at 1072–73.

## Discussion

■ The critical issue before this Court is whether the trial justice properly found that the state had presented sufficient evidence to establish guilt beyond a reasonable doubt as to the two possession counts and the one count of conspiracy to violate the Uniform Controlled Substances Act. Because the state's case relied entirely upon circumstantial evidence, this Court is mindful that "[i]n certain cases and under certain conditions, we have prohibited the 'pyramiding of inferences,' or the drawing of a secondary inference from an initial inference, to establish an element of an offense." *State v. Mercado,* 635 A.2d 260, 264 n. 4 (R.I.1993) (quoting *Waldman v. Shipyard Marina, Inc.,* 102 R.I. 366, 373–75, 230 A.2d 841, 845–46 (1967)). "[A] finding of guilt will be warranted only if those facts and circumstances, taken together, are not only consistent with the hypothesis that defendant was guilty, but also are inconsistent with any reasonable hypothesis that he was innocent." *State v. Fortes,* 110 R.I. 406, 409, 293 A.2d 506, 508 (1972). Here, the state's case depended on the same evidence for both possession and conspiracy.

■ We first consider the trial justice's finding on the two counts of possession of a controlled substance with intent to deliver.[5] In Rhode Island, possession of a controlled substance requires two elements: (1) intentional control of the illicit substance and (2) knowledge of the substance's nature. *Mercado,* 635 A.2d at 262; *see also State v. Jenison,* 442 A.2d 866, 875 (R.I.1982) (quoting *State v. Gilman,* 110 R.I. 207, 215, 291 A.2d 425, 430 (1972)). Possession can be either actual or constructive. *Jenison,* 442 A.2d at 875.

---

**5.** The defendant concedes that if the evidence were sufficient to establish possession, then the amount of cocaine seized, each package containing in excess of six ounces, was suffi- cient to give rise to a reasonable inference of intent to deliver all or some of the contraband.

Constructive possession "occurs when an individual exercises dominion and control over [an] object even though it is not within [the individual's] immediate physical possession." *Id.* (citing *In re Caldarone,* 115 R.I. 316, 326, 345 A.2d 871, 876 (1975) and *State v. Motyka,* 111 R.I. 38, 40–41, 298 A.2d 793, 794 (1973)). Moreover, "[p]roof of the knowledge which is essential to conviction may be shown by evidence of acts, declarations or conduct of the accused from which an inference may be fairly drawn that he knew of the existence of narcotics at the place where they were found." *Gilman,* 110 R.I. at 216, 291 A.2d at 431. Although consciousness of the presence of the object is essential to a finding of constructive possession, the fact the object is located within property under the individual's control does not, in and of itself, constitute constructive possession. *Motyka,* 111 R.I. at 41, 298 A.2d at 794 (citing *Amaya v. United States,* 373 F.2d 197, 199 (10th Cir.1967)).

Our careful examination of the record in this case leads to the inescapable conclusion that the state's evidence with respect to both possession and conspiracy counts was inferential in all aspects and that there was no direct evidence of defendant's culpability. The state presented the testimony of Special Agent Hickey, who recounted his contacts with the informant. Specifically, Agent Hickey said that he received and then conveyed to other law enforcement operatives information that a blue Dodge Intrepid with Massachusetts license plates would be picking up two Hispanic females at T.F. Green Airport. He said that he was informed that the women would be arriving from Phoenix, a known drug-trafficking distribution hub. The informant also provided Agent Hickey with information that the vehicle would be driven by a dark-complected Hispanic-looking male from the New Bedford area. It was conveyed that this male—"most likely operating the vehicle, at least in the vehicle"—possibly was the subject of a warrant for arrest, would be operating the vehicle on a suspended driver's license, was known to carry weapons, and would possibly have a weapon in the car.[6] The informant also predicted that a fairly substantial quantity of drugs could be found in the vehicle.

We observe that the informant's predictive information about the make, model, and state registration of the car and description of the driver did prove to be accurate. The vehicle did, in fact, pick up at T.F. Green two Hispanic women who were arriving from Phoenix. Moreover, illicit drugs, two cucumber-shaped packages of cocaine, were, in fact, discovered. However, although the packages containing the contraband were in the vehicle, they were concealed inside the purses of the two women. Thus, with respect to the information provided about defendant-driver, Mr. Berroa, the most that can be said with certainty is that he was, in fact, a dark-skinned Hispanic driving the vehicle for which the police were looking.

To provide detail to the mosaic of inference upon which the state sought conviction, the state offered Agent Toracinta to testify to certain signs of nervousness that defendant exhibited while at the drug-interdiction scene. These signs of nervousness consisted of a visibly pulsing left carotid artery and defendant's kicking at grass after he was removed and separated from the vehicle being searched. The trial justice, however, discounted this testimony, reasoning: "perhaps he did exhibit some

---

**6.** This information was incorrect. The driver had a valid New York license, was not the subject of any outstanding warrants, and did not have any firearms on his person or within the vehicle.

signs of nervousness but nervousness alone is not an indicia of guilt. Most persons who are reasonably law-abiding persons when stopped by law enforcement officers are going to exhibit some indicia of nervousness." However, based upon the evidence that he did consider,[7] the trial justice found:

> "The State has argued and has laid a very strong foundation that these women were here in Rhode Island to deliver a very, very expensive amount of controlled substance material. The reasonable inference that this Court has to draw from the totality of the circumstances is that this defendant was there to collect these people for the sole purpose of furthering that enterprise. There is no other reason for it.
>
> " * * *
>
> "To think otherwise would make an absurd conclusion out of the fact pattern testified hereto over these last two days. So the Court finds him guilty of conspiracy, the weight is uncontroverted, the weight is definitely in excess of the statutory requirement for conviction under the statute upon which the defendant has been indicted, and certainly all of the indicia is and the size of the shipment and the manner in which it was conducted, he has to be found guilty of possession with intent to deliver."

We respectfully disagree. Although we recognize that the facts in the record may lead to speculation or conjecture about the mode of operation of a sophisticated drug-trafficking scheme, in our opinion, there is a manifest failure of proof, and the evidence simply is not sufficient to affirm the conviction.

In analyzing the record before us we have looked to our opinion in *Jenison.* There, we reversed the trial justice's denial of the defendant's motion to dismiss the case, in which the state's inferential evidence for constructive possession of narcotics consisted of a driver's (1) alleged association with drug trafficking, (2) presence at a site where narcotics-related activity had occurred earlier in the day, and (3) presence with a passenger discovered to have approximately six ounces of cocaine concealed in her purse. *Jenison,* 442 A.2d at 871, 874–76. We said, "to draw an inference of constructive possession solely from an individual's mere presence at a site where narcotics are found is 'conjectural and speculative' and not 'reasonable and rational.'" *Id.* at 876 (quoting *In re Caldarone,* 115 R.I. at 326–27, 345 A.2d at 876).

We also have relied on our holding in *Fortes,* 110 R.I. at 407, 293 A.2d at 507, in which the defendant was tried and convicted of unlawful possession before a Superior Court justice sitting without a jury. In *Fortes,* the state's evidence consisted of two barbiturate pills that police found in the bucket seat of a vehicle just vacated by the defendant, who did not own the vehicle and who was a passenger therein. *Id.* In addition, the defendant was believed by police to be a user and pusher of drugs, the vehicle in which the defendant was a passenger was identified by police as previously having been parked near a residence under surveillance by police, and the vehicle had been erratically operated in a seeming effort to evade police. *Id.* However, there was no testimony that defendant knew he had been sitting on the pills, or that he had ever controlled or exercised any degree of possession, either construc-

---

7. The state presented the testimony of a total of six law enforcement officials; however, aside from Agent Hickey and Agent Toracinta, the remaining testimony relates to the stop and search and provides no relevant evidentiary insight advancing the state's proof against Mr. Berroa concerning possession or conspiracy.

tive or actual, over them. *Id.* at 409, 293 A.2d at 508–09. We reversed in *Fortes* because, as here, the evidence was insufficient to support a finding of guilt beyond a reasonable doubt on the elements of possession. In that case, we held:

> "[I]t becomes obvious that the circumstantial evidence essential to a conviction in this case was not incompatible with a reasonable hypothesis of innocence, and that it failed to exclude every reasonable hypothesis but that of guilt. The trial justice was, therefore, clearly wrong when he found that all of the facts and circumstances necessary to the proof of the crime charged had been established beyond a reasonable doubt." *Id.* at 410, 293 A.2d at 509.

Here, as in *Fortes*, defendant was frisked when he was removed from the vehicle, but neither drugs nor weapons were found on his person. Moreover, we reversed in *Fortes* despite an independently formed "belief" by police officers that the defendant was involved in the use and sale of drugs. In the matter now before us, all focus upon defendant flowed through the tip of an informant, whose information about defendant proved to be inaccurate in its most negative details. Lastly, as was repeatedly affirmed throughout testimony, in all respects Mr. Berroa was not evasive, cooperative and fully compliant with the numerous officers and agents on the scene. *Cf. Mercado*, 635 A.2d at 263–64 (affirming conviction when the defendant's representations, deemed to be either lying or the product of deliberate ignorance, contributed strongly to produc-

ing "a comprehensive web of strong circumstantial evidence" sufficient to support a finding of constructive possession of the large shipment of heroin locked in the trunk of the vehicle in which he was a passenger); *In re Caldarone*, 115 R.I. at 327, 345 A.2d at 876–77 (quashing jury verdict despite positive findings as to both the inferential value of presence and flight).

 We next examine the trial justice's finding on the charge of conspiracy.[8] It is well settled that, "the gist of a conspiracy is the unlawful combination of two or more persons to do an unlawful act or a lawful act for an unlawful purpose with the offense being complete once the agreement is made." *Gilman*, 110 R.I. at 218, 291 A.2d at 432; *see also State v. Murphy*, 113 R.I. 565, 572, 323 A.2d 561, 564 (1974). "Anyone, knowing of the conspiracy, who intentionally takes part in or does any act to further the illegal agreement becomes a participant in the conspiracy." *Gilman*, 110 R.I. at 218, 291 A.2d at 432. Because conspiracy rarely can be proven by direct evidence, "illegal confederacy may be inferentially established by proof of the relation, conduct, circumstances and acts of the parties." *Id.*; see also *State v. Lassiter*, 836 A.2d 1096, 1104 (R.I.2003). "This is true only, however, 'as long as the totality of the circumstantial evidence presented to the finder of fact constitutes proof of guilt beyond a reasonable doubt.' " *State v. Disla*, 874 A.2d 190, 197 (R.I.2005) (quoting *State v. Rodriguez*, 798 A.2d 435, 437 (R.I.2002)).

---

**8.** As was recently expressed in *State v. Ros*, 973 A.2d 1148, 1164 (R.I.2009), we note that "Rhode Island adheres to the *Pinkerton* theory of vicarious liability, which holds a coconspirator criminally liable for the actions of another coconspirator if those actions were committed in furtherance of an existing conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 645, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (each defendant could be found guilty of the substantive offenses charged 'if it was found at the time those offenses were committed [defendants] were parties to an unlawful conspiracy and the substantive offenses charged were in fact committed in furtherance of it')."

Here, there is a serious lack of proof of any agreement to advance a conspiracy. In our opinion, this case is firmly controlled by a myriad of holdings that prohibit the pyramiding of inferences. We have said, "it is well established that '[t]hrough a process of logical deduction, the state may prove guilt from an established circumstantial fact through a series of inferences.'" *State v. Kaba*, 798 A.2d 383, 398 (R.I.2002) (quoting *State v. Dame*, 560 A.2d 330, 334 (R.I.1989)). However, "[i]f [the] pyramiding of inferences becomes speculative, [then] proof of guilt beyond a reasonable doubt will not be found." *Id.; see also State v. Alexander*, 471 A.2d 216, 218 (R.I.1984). "We have recognized that pyramiding of inferences becomes speculative when the initial inference rests upon an ambiguous fact that may support other inferences which are clearly inconsistent with guilt." *State v. Kaba*, 798 A.2d at 398; *see State v. Caruolo*, 524 A.2d 575, 582 (R.I.1987).

Furthermore, when the evidence before the trial court was insufficient to support a conclusion beyond a reasonable doubt that the defendant had knowledge of and intended to exercise control over the cocaine found in the women's purses, it defies logic to extract from the same set of facts a supportable inference that he agreed with these same women to traffic in drugs. In *State v. Grullon*, 984 A.2d 46, 48–49 (R.I. 2009), we inferred an agreement sufficient to sustain a conspiracy conviction when each party independently had possessed and delivered cocaine to an undercover informant, and when one of them had directed the undercover purchaser to see the other dealer, his brother, in his absence. Here, there is simply no evidence that can serve as a reasonable foundation for an agreement between Mr. Berroa and the two women he picked up at the airport.

### Conclusion

For the reasons set forth in this opinion, we vacate the judgment of conviction. The record is remanded to the Superior Court for entry of judgment of acquittal.